[T]he school board's uniform policy will pass constitutional scrutiny if it furthers an important or substantial government interest; if the interest is unrelated to the suppression of student expression; and if the incidental restrictions on First Amendment activities are no more than is necessary to facilitate that interest.

*Id.* (citing *United States v. O'Brien*, 391 U.S. 367, 377 (1968)).  Applying that test to the present case, I would conclude that a stable, disruption-free educational environment is a substantial government interest, that the interest is unrelated to the suppression of student expression, and that by limiting the prohibition to clothing which will be disruptive, the school minimizes First Amendment restrictions to no more than what is necessary to facilitate that interest.

I concur in remanding this case to the district court for necessary findings of fact.  I would conclude, however, that if the district court finds evidence to support defendants' contention that principal Fultz reasonably believed that a prior fight occurred as a result of the presence of a confederate flag and that prior fight gave Fultz reason to anticipate additional disruption, then defendants' regulation of plaintiffs' conduct was no more than that necessary to achieve a compelling government interest and did not violate the First Amendment.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2001 FED App. 0064P (6th Cir.)
File Name:  01a0064p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

TIMOTHY CASTORINA, by and through his parent and guardian, Patsy Rewt,
    *Plaintiff-Appellant,*

No. 99-6309

TIFFANY DARGAVELL, by and through her parents and guardians, Greg and Sandra Dargavell,

    *Plaintiff,*

    *v.*

MADISON COUNTY SCHOOL BOARD; SHANNON JOHNSON; WILLIAM FULTZ; SHANNON JOHNSON, as Superintendent of the Madison County School District; WILLIAM FULTZ, as Principal of Madison Central High School,
    *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 98-00068—Henry R. Wilhoit, Jr., District Judge.

Argued:  December 7, 2000

Decided and Filed:  March 8, 2001

Before:  MERRITT, KENNEDY, and GILMAN, Circuit
Judges.

_____

**COUNSEL**

**ARGUED:**  Chadwick Kyle Sayre, Portsmouth, Ohio, for
Appellant.  William H. Fogle, Mt. Sterling, Kentucky, for
Appellees.  **ON BRIEF:**  Kirk D. Lyons, SOUTHERN
LEGAL RESOURCE CENTER, INC., Black Mountain,
North Carolina, for Appellant.  William H. Fogle, Mt.
Sterling, Kentucky, for Appellees.

MERRITT, J., delivered the opinion of the court, in which
GILMAN, J., joined.  KENNEDY, J. (pp. 14-20), delivered
a separate concurring opinion.

_____

**OPINION**

_____

MERRITT, Circuit Judge.  Principal William Fultz of
Madison County High School twice suspended students
Timothy Castorina and Tiffany Dargavell for wearing T-shirts
displaying the Confederate flag; the rationale for the
suspensions was that the T-shirts violated the school dress
code, which bans clothing containing any "illegal, immoral or
racist implications."  Following their suspensions, the
students brought suit challenging the constitutionality of the
disciplinary actions and the district court granted summary
judgment for the school board.  After reviewing that decision,
we find that we are unable to resolve the constitutionality of
the school board's actions without knowing the manner in
which the school board enforced its dress code and whether

school activities.  *See Tinker*, 393 U.S. at  511; *Grayned*, 408
U.S. at 119.[2]

The Fifth Circuit's recent evaluation of First Amendment
protection in a school setting is applicable here.  *See Canady
v. Bossier Parish School Board*, 2001 WL 58722 (5th Cir.
Jan. 23, 2001).  In *Canady* the Fifth Circuit upheld a school's
right to enforce a mandatory school uniform.  After
acknowledging that the question of school uniforms did not
fit exactly within the three categories established by *Tinker v.
Des Moines Independent School District*, 393 U.S. 503 (1969)
(addressing school regulation directed at specific student
viewpoints), *Bethel School District v. Fraser*, 478 U.S. 675
(1986) (addressing student expression involving lewd, vulgar
or obscene speech), and *Hazelwood School District v.
Kuhlmeier*, 484 U.S. 260 (1988) (addressing school-
sponsored student speech), the court held that:

> Because (1) choice of clothing is personal expression that
> happens to occur on the school premises and (2) the
> School Board's uniform policy is unrelated to any
> viewpoint, a level of scrutiny should apply in this case
> that is higher than the standard in *Kuhlmeier*, but less
> stringent than the school official's burden in *Tinker*.

*Canady*, 2001 WL 58722, *5.  That same standard should
apply to the present case, where (1) plaintiffs' choice of
confederate flag shirts was personal expression and was
clearly not school sponsored, and (2) the relevant portion of
the dress code policy, banning disruptive clothing, is
viewpoint neutral.  In formulating that standard, the Fifth
Circuit then concluded that:

_____

[2]I certainly agree with the principle put forth by the majority that
regulation of First Amendment speech must be content neutral.  Because
the implicated portion of the school's dress code policy prohibiting any
dress which would cause disruption is content neutral, however, I simply
do not find a discussion of content neutrality dispositive in this case.

could certainly be restricted, but only if the forbidden conduct "materially disrupts classwork or involves substantial disorder or invasion of the rights of others."

*Grayned*, 408 U.S. at 117-18 (citing *Tinker*, 393 U.S. at 513). Furthermore, in upholding the city ordinance prohibiting noisy and disruptive picketing outside a school, the *Grayned* Court explained that the ordinance was constitutional because:

> [The ordinance] goes no further than *Tinker* says a municipality may go to prevent interference with its schools. It is narrowly tailored to further [the town's] compelling interest in having an undisrupted school session conducive to the students' learning, and does not unnecessarily interfere with First Amendment rights. Far from having an impermissibly broad prophylactic ordinance, [the town] punishes only conduct which disrupts or is about to disrupt normal school activities. That decision is made, as it should be, on an individualized basis, given the particular facts of the situation.

*Id.* at 119. Thus, the only conduct that can be regulated in order to achieve the compelling interest of a stable educational environment is activity which will disrupt that environment. No other regulation of protected speech can be considered narrowly tailored to meet this compelling interest. In short, evidence of likely disruption is both sufficient and necessary to justify regulation of protected speech in a school setting. Therefore, I would not only conclude that the school would not necessarily be required to prohibit Malcolm X shirts if it prohibits confederate flag shirts, but in fact, I question whether the school could be permitted to prohibit displaying a symbol of either Malcolm X or the confederate flag unless it could show evidence that such a display would result in disruption. First Amendment protected conduct may only be regulated if it disrupts or is about to disrupt normal

Madison County High School had actually experienced any racially based violence prior to the suspensions. As a result, material questions of fact remain which render this case inappropriate for summary judgment and we therefore remand this case to the district court for trial. Once the district court has made the necessary findings of fact, it should apply the legal framework set forth in this opinion.

## I. Facts

In the fall of 1997, when all of the events in question took place, Timothy Castorina and Tiffany Dargavell were students at Madison Central High School, located in Madison County, Kentucky. Castorina was a junior and Dargavell a freshman. At the time, Castorina and Dargavell were dating. Neither had previously experienced any significant disciplinary problems.

On the morning of September 17, both plaintiffs arrived at school wearing matching Hank Williams, Jr. concert T-shirts given to them by Dargavell's father. Country music star Hank Williams, Jr. was pictured on the front of the T-shirts and two Confederate flags were displayed on the back, along with the phrase "Southern Thunder." The plaintiffs said that they were wearing the T-shirts in commemoration of Hank Williams, Sr.'s birthday and to express their southern heritage. When the two students went to the principal's office to change Dargavell's class schedule, the principal, William Fultz, informed them that the Confederate flag emblem violated the school's dress code. He gave the students the choice of either turning the shirts inside out for the rest of the day or returning home to change. Fultz based this instruction on his interpretation of the school's dress code, which prohibits students from wearing any clothing or emblem "that is obscene, sexually suggestive, disrespectful, or which contains slogans, words or in any way depicts alcohol, drugs, tobacco or any illegal, immoral, or racist implication." The dress code specified that if the violation could not be corrected at school, then the principal had the authority to send the offender home

to change and to assign appropriate punishment. When Castorina and Dargavell refused to comply with his directives, Fultz called their parents. He explained to the parents that the clothing was a violation of the dress code, but that if the parents convinced the students to go home and change there would be no disciplinary action. If the students refused to change, they would be suspended for three days. The parents strongly supported their children's decision, and Fultz suspended each student. At the end of the three days, Castorina and Dargavell returned to school wearing the same shirts. Fultz again explained that the flag was offensive to other students and a violation of the dress code. When the parents reiterated their support for the students' desire to wear the T-shirts, Fultz suspended them for a second three-day period. Castorina and Dargavell never returned to Madison Central and were subsequently given home-schooling by their parents.

In ruling on the students' suit challenging their suspensions, the district court found that wearing the T-shirts did not qualify as "speech" and that even if it were "speech," the plaintiffs failed to show a First Amendment violation. In addition, the court rejected the plaintiffs' contention that the school dress code was vague and overbroad. The Court then dismissed all supplemental state claims without prejudice.

## II. Analysis

This case raises two main questions: (1) does wearing the Confederate flag T-shirts qualify as the type of speech covered by the First Amendment, and (2) if so, is that speech protected given the special rules governing schools' authority to regulate student speech? The district court's answer to the first question -- that wearing the Hank Williams, Jr. T-shirts did not qualify as "speech" -- was incorrect. The plaintiffs wore the shirts to express a certain viewpoint and that viewpoint was easily ascertainable by an observer. On the second question, viewing all of the facts in the light most favorable to the plaintiffs, it appears that the school board

that "cause[s] disruption of the educational process." (J.A. 81.)

The majority subsequently concludes, however, that prohibiting the confederate flag shirts while other students were allowed to wear Malcolm X shirts was not permissible as it amounted to viewpoint discrimination. I would note that while there is a factual dispute, principal Fultz testified that he had on several occasions asked students to take off a Malcolm X shirt, but that he had not seen one recently.[1] Under relevant Supreme Court caselaw, including *Tinker*, I believe that the presence of Malcolm X shirts is irrelevant to the analysis in this case. Although the *Tinker* Court did say that "[i]t is also relevant that the school authorities did not purport to prohibit the wearing of all symbols of political or controversial significance," the Court then immediately acknowledged that the case would be different were there evidence of disruption. *Id.* at 510. The Court stated that, "conduct by the student, . . . which for any reason . . . materially disrupts classwork or involves substantial disorder . . . is, of course, not immunized by the constitutional guarantee of freedom of speech." *Id.* at 513. The Supreme Court has itself reviewed *Tinker* in *Grayned v. City of Rockford*, 408 U.S. 104 (1972). There, the Court explained the holding in *Tinker*:

> [W]e nowhere suggested that students, teachers, or anyone else has an absolute constitutional right to use all parts of a school building or its immediate environs for his unlimited expressive purposes. Expressive activity

---

[1] Fultz's deposition testimony was as follows:
Q: How many times have you asked somebody to take a Malcolm X shirt off in your school?
A: I've asked them on--I can't count, but I've asked them on several occasions.
Q: When was the last time you asked them?
A: I don't recall. I haven't seen one this year.
(J.A. 177.)

In addition, I cannot agree with the majority's statement that the school's "rationale for the suspensions was that the T-shirts violated the school dress code, which bans clothing containing any 'illegal, immoral or racist implications.'" While I agree that principal Fultz banned the shirts because they violated the school's dress code, he did not rely on the "racist implications" portion of the policy. Contrary to the majority's description of the facts, Fultz's deposition testimony clearly indicates that he explicitly refused to say that he thought the flag was racist:

> Q: Now, isn't it true that you told my clients, and the parents of my clients that the Confederate Flag was a racist symbol on that day?
> A: I don't know if I said it in that terms. I said that the Confederate Flag is offensive to certain students.
> . . .
> Q: So to the best of your recollection you never related to them that it was your opinion that the Confederate Battle Flag is a racist symbol, is that your testimony?
> A: That is my opinion. I think in my opinion the Confederate Flag is offensive to black students.

(J.A. 170-71.) Later in the deposition, plaintiffs' attorney and Fultz had the following exchange:

> Q: Well, let me just cut right to the chase then. Do you think the Confederate Flag is a racist symbol?
> A: That's, you know, as far as I'm concerned the Confederate Flag or any of the other kinds of shirts is not all that offensive to me personally, but I do know that it causes conflict between the students and that my job is to try to help maintain a safe and orderly environment for students to learn and teachers to teach.

(Fultz Dep. 32.) Thus, when he banned plaintiffs' shirts, the record permits the finding that Fultz acted under the portion of the school's dress code policy which prohibits any attire

enforced the dress code in an uneven and viewpoint-specific manner, thereby violating core values of the First Amendment. In addition, the school has not shown that the plaintiffs' conduct creates a likelihood of violence or other disruption that warrants this kind of regulation.

**1. The Plaintiffs' Conduct was Speech Governed by the First Amendment.** – In *Texas v. Johnson*, 491 U.S. 397 (1989) (the flag-burning case), the Supreme Court laid out the standard for what conduct constitutes expression protected by the First Amendment. This inquiry focused on "whether [a]n intent to convey a particularized message was present and [whether] the likelihood was great that the message would be understood by those who viewed it." *Id.* at 404. In the instant case, the district court concluded that the plaintiffs intended to commemorate Hank Williams, *Sr.*'s birthday. The court found that this was a particularized message, but that this message was unascertainable based on the plaintiffs' decision to wear a Hank Williams, *Jr*. T-shirt. The court characterized the wearing of these T-shirts as a "mere display" of a confederate flag and ruled that this did not result in a finding of protected speech. Both plaintiffs, however, testified that they intended to convey pride in their southern heritage in addition to any message associated with Hank Williams, Sr. The school board does not dispute the plaintiffs' claim that they also intended to affirm their southern backgrounds. The T-shirts prominently displayed two Confederate flags and the phrase "Southern Thunder." In addition, both Hank Williams, Sr. and Hank Williams, Jr. are singers whose songs have strong appeal in the South. We therefore conclude that the plaintiffs intended to express more than a mere appreciation for the life and music of either performer. Further, their decision to return to school at the end of the first suspension still wearing the T-shirts demonstrates that the students fully appreciated the message that school administrators understood the T-shirts to convey. Because the plaintiffs' intended expression was both a commemoration of Hank Williams, Sr.'s birthday as well as a statement affirming the plaintiffs' shared southern heritage, their decision to wear the

Hank Williams T-shirts constitutes speech falling within the First Amendment.

**2.    The School Board's Authority To Regulate the Plaintiffs' Speech.** – This case is governed by the Supreme Court's landmark decision concerning student speech, *Tinker v. Des Moines Independent School District*, 393 U.S. 503 (1969). While *Tinker* has been narrowed by two more recent cases, *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986), and *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), neither of these decisions altered *Tinker*'s core principles concerning the circumstances under which public schools may regulate student speech. In *Tinker*, the Supreme Court struck down the school district's ban on the wearing of black armbands to protest the Vietnam War. Central to the decision was the fact that the school district did not ban other clothing that expressed controversial views, including Iron Crosses, which were often understood as symbols of Hitler and the Nazis. *Tinker*, 393 U.S. at 506-511. This aspect of the decision is consistent with a number of later Supreme Court decisions signaling that viewpoint-specific speech restrictions are an egregious violation of the First Amendment. *See*, *e.g.*, *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, 828-29 (1995) ("Discrimination against speech because of its message is presumed to be unconstitutional"), *R.A.V. v. St. Paul*, 505 U.S. 377, 391-92 (1992) (striking down a Minnesota hate-speech statute on the basis of impermissible viewpoint discrimination).

In contrast, *Fraser* concerned a school's decision to discipline a student after he used "offensively lewd and indecent speech" during a speech nominating a classmate for a position in the student assembly. The Court found that this was not protected speech and that the school had an interest in teaching students the boundaries of socially appropriate behavior that provided some room for a school to regulate speech which would otherwise be protected. *Fraser*, 478 U.S. at 682-685. In *Hazelwood*, the Court upheld the school's

no evidence of disruption to justify the regulation. But *Tinker* acknowledged that actual disruption may justify regulation of speech, explaining that "the prohibition of expression of one particular opinion, *at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline*, is not constitutionally permissible." *Id.* at 511 (emphasis added).

The Sixth Circuit has previously recognized that a showing of likely disruption is the central tenet to permissible regulation of First Amendment speech in a school setting. In *Melton v. Young*, 465 F.2d 1332 (6th Cir. 1972), this court upheld a school regulation banning the display of the confederate flag. The *Melton* court held that "[u]nlike the *Tinker* case, where the Court found no evidence of either actual or potential disruptive conduct, but only an 'undifferentiated fear or apprehension of disturbance,' the record in the present case reflects quite clearly that . . . school officials had every right to anticipate that a tense racial situation continued to exist as of the opening of school." *Id.* at 1335. Thus, the school was allowed to regulate because of factual evidence showing that the flag would cause disruption.

In the present case, a physical fight between students, one day earlier, caused by an image of the confederate flag, would give the principal a concrete basis to think additional disruption would ensue if plaintiffs were permitted to wear the flag shirts. The prior fight distinguishes this case from *Tinker* and places it in the category of cases in which factual evidence demonstrates that disruption will likely result. The majority claims that the evidence of the fight is not dispositive because other students testified that the fight was not about the confederate flag. The critical issue, however, is whether the principal acted on what he reasonably believed to be actual evidence that the shirts would be disruptive. So long as he was told by a student that a confederate flag was the subject of the prior fight and he was not unreasonable for believing that student, he had a reasonable basis to infer that plaintiffs' shirts would spark more disruption.

———————————

**CONCURRENCE**

———————————

KENNEDY, Circuit Judge, concurring. I concur with the majority in remanding this case to the district court to resolve the factual issues, and I concur with Part II.1 of the majority opinion holding that the conduct in question constitutes First Amendment protected speech. I write separately, however, because I disagree with the analysis in Part II.2 of the majority opinion. Contrary to the majority's argument, I find that individual speech not sponsored by the school may be regulated in a school setting if and only if there is specific evidence to support a belief that the conduct will result in disruption to the school's educational environment.

The majority accepts the argument that this case is factually similar to *Tinker* and is therefore governed by the Supreme Court's holding there, invalidating a school's ban on black armbands worn to protest the Vietnam war. The majority apparently fails to recognize, however, that in *Tinker*, the Court explicitly relied on the fact that "there were no threats or acts of violence on school premises," *id*. at 508, while in the present case, there is evidence to support a likelihood of disruption. Despite the majority's summary statement that the school banned the confederate flag shirts "without any showing of disruption," the record shows that a fight broke out involving students wearing confederate flag T-shirts the day before Fultz prohibited plaintiffs from wearing their shirts, and Fultz stated that students told him that the confederate flag was the cause of that prior fight. (J.A. 173.) Although it is clear that even in a school setting "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression," *id*. at 508, the Supreme Court has recognized a compelling government interest in protecting a school's educational environment. *Tinker* rejected a school's ability to regulate based on the content of the views expressed where there was

decision to censor certain articles in the school newspaper. The Court found that the school newspaper was not a public forum and that school officials are entitled to exercise greater control over "school-sponsored" speech such as a school newspaper. *Hazelwood*, 484 U.S. at 268-273. Beyond the three "school-speech" Supreme Court cases and the well-developed line of Supreme Court decisions prohibiting viewpoint discrimination, two Court of Appeals decisions, *Melton v. Young*, 465 F.2d 1332 (6th Cir. 1972), and *West v. Derby Unified School District No. 260*, 206 F.3d 1358 (10th Cir. 2000), are relevant in that they uphold a public school's authority to ban Confederate flags in somewhat different factual circumstances.

The facts, when viewed in the light most favorable to the plaintiffs, distinguish the Madison County ban on Confederate flags from the bans upheld in all four of these cases. First, the plaintiffs testified that other members of the student body wore clothing venerating Malcolm X and were not disciplined. Second, the plaintiffs were wearing the disputed clothing in a manner that did not disrupt school activity or cause unrest during the school day. Third, Castorina and Dargavell were clearly making a personal statement in deciding to wear the Hank Williams, Jr. T-shirts; in other words, there is no way that their speech could be considered to be "school-sponsored," nor did the students use any school resources to express their views.

Taking these facts into consideration, the Madison County case is more analogous to *Tinker* than to either *Fraser* or *Hazelwood*. In *Tinker*, the Des Moines school board had adopted a policy specifically banning the wearing of black armbands. The policy stated that any students found in violation would be asked to remove the offending article; if the student refused, suspension would follow until the student returned without the armband. The plaintiffs intentionally violated the policy and were sent home. Following their legal challenge to the suspension, the Supreme Court struck down the school policy as unconstitutional. As a preliminary

matter, the Court formally recognized the fact that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506. Though schools have the authority to set regulations pertaining to the length of skirts or hair, the Court held that there was no basis for a policy that punished "silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of petitioners." *Id.* at 508. The Court drew special attention to the fact that the plaintiffs' actions did not cause any interference "with schools' work or [] collision with the rights of other students to be secure and to be let alone." *Id.* In the lower court proceedings, the district court had based its decision upholding the school board's actions on the fear of disturbance, but the Supreme Court rejected this argument because "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.* In addition, the Supreme Court was clearly influenced by the fact that the school board adopted a policy that only banned black armbands, and not other potentially disruptive symbols. *Id.* at 510. For example, the Court specifically noted that the school board banned black armbands while allowing students to wear the Iron Cross, a symbol that obviously invoked images of Nazi Germany. *Id.* In the instant case, Dargavell and Castorina claim that students in Madison County wore clothing bearing the "X" symbol associated with Malcolm X and the Black Muslim movement. The school's refusal to bar the wearing of this apparel along with the Confederate flag gives the appearance of a targeted ban, something that the Supreme Court has routinely struck down as a violation of the First Amendment. *See e.g.*, *Police Department of Chicago v. Mosley*, 408 U.S. 92 (1972) (striking down a no-picketing law that contained an exception for only labor-related picketing), *City of Madison, Joint School District No. 8 v. Wisconsin Employment Relations Commission*, 429 U.S. 167 (1976) (holding that a school board cannot bar only non-union teachers from speaking at a public meeting concerning the board's labor relations). The Court has held that this type of ban is a "more blatant" violation of the First Amendment

the school and that the committee's specific findings showed that there was more than "an undifferentiated fear or apprehension of disturbance." *Melton*, 465 F.2d at 1334-35. As a result, the court recognized that though the case was a close one, the suspension was a valid exercise of the school board's constitutional authority under *Tinker*. *Id.*

The foregoing discussion of the three Supreme Court and two Court of Appeals cases demonstrates the importance of the factual circumstances in school speech cases and why a remand is necessary in this case so that the district court can resolve the plaintiffs' factual assertions. If the students' claims regarding the Malcolm X-inspired clothing (i.e. that other students wore this type of clothing and were not disciplined) and their claims that there were no prior disruptive altercations as a result of Confederate flags are found credible, the court below would be required to strike down the students' suspension as a violation of their rights of free speech as set forth in *Tinker*. In addition, even if there has been racial violence that necessitates a ban on racially divisive symbols, the school does not have the authority to enforce a viewpoint-specific ban on racially sensitive symbols and not others. Conversely, if the students cannot establish their factual claims, then the principal and school board may have acted within their constitutional authority to control student activity and behavior. In either circumstance, the facts are essential to the application of the legal framework discussed herein. Accordingly, the summary judgment is reversed and the case remanded to the district court for trial.

picture of a Confederate flag during his math class, thus violating the school's "Racial Harassment and Intimidation" policy. He was subsequently suspended and brought suit challenging the constitutionality of his punishment. The Tenth Circuit upheld the suspension as a legitimate exercise of the school's authority. Though this may appear facially similar to the Madison County controversy, in *West* there had been actual fights involving racial symbols (the Confederate flag in particular) in the school district and there was no evidence that the school district enforced the Racial Harassment and Intimidation policy in a manner that favored one type of potentially racially divisive symbols over another. As a result, the Tenth Circuit's decision in *West* merely demonstrates that a school board may ban racially divisive symbols when there has been actual racially motivated violence and when the policy is enforced without viewpoint discrimination. Since the Madison County action does not appear to satisfy either one of these criteria, the Tenth Circuit decision is of limited utility in the adjudication of the case before this court.

Similarly, this court's decision in *Melton* concerned a Chattanooga public school's 1970 suspension of a student for wearing a jacket with a Confederate flag patch. The school in question, which had previously been an all-white school, was integrated in 1966, only four years before the suspension. In that four year period, the high school in question experienced significant racial tension, much of which sprung from the school's symbol (the Confederate flag), the school's athletic nickname (the "Rebels") and the school's fight song ("Dixie"). Following these problems, a special committee convened to address these racial problems made a specific finding that the Confederate flag was a cause of unrest. Relying on that finding, the school board banned the display of the Confederate flag. Having been informed of the ban, plaintiff Melton then wore a jacket with a Confederate flag patch to school and was suspended. In reviewing his suspension, this court applied *Tinker* to the regulation, finding that the history of unrest amounted to a material disruption at

because "government regulation may not regulate speech based on its substantive content or the message it conveys." *Rosenberger*, 515 U.S. at 828-29.

Viewing the facts in the light most favorable to the students, the school has banned only certain racial viewpoints without any showing of disruption. As a result, without any formal factual findings to guide us, we see no obvious differences between the *Tinker* and Madison County situations other than the fact that the Des Moines School Board adopted a formal policy banning black armbands before the students ever wore them, whereas the Madison County School Board banned Confederate flags in a more "ad hoc" manner. This means that in *Tinker* there was a formally targeted ban from the very beginning, whereas the Madison County dress code is a facially neutral policy that is enforced, according to the students, in a content-specific manner. If the students' claim is true, only certain ideological positions are barred from expression on school property. Based on the Supreme Court rulings in *Tinker*, *Mosley* and *Rosenberger*, the school board cannot single out Confederate flags for special treatment while allowing other controversial racial and political symbols to be displayed.

The more recent Supreme Court decisions discussing schools' authority to regulate student speech are not applicable to this situation. Both *Fraser* and *Hazelwood* -- the two cases often cited for public schools' power to regulate their students' speech -- contain important factual differences that distinguish them from the instant controversy. *Fraser* upheld the disciplining of the student's profane nominating speech based on the school's need to teach students about appropriate societal behavior; furthermore, the Court found that the school had wide latitude in determining the "manner of speech" that was permissible on school grounds. *Fraser*, 478 U.S. at 683. In the instant case, however, the school is not attempting to regulate the "manner of speech." For example, a student would be permitted to attend class wearing a T-shirt with a flag on it if the flag was in support of the

country's Olympic team. As a result, it is the content of speech, not the manner, that the Madison County School Board wishes to regulate. In addition, a clear underpinning of the Court's holding in *Fraser* was the disruptive nature of the plaintiff's nominating speech and the fact that the sanctions were not based on one particular political viewpoint. *Id.* at 685. Assuming that there has not been any racially motivated violence or threat in the Madison County schools, the plaintiffs' display of the Confederate flag may not have had any significant disruptive effect. The defendants do claim that prior to the plaintiffs' suspension, there was a racially based altercation on school grounds, but plaintiffs contend that race was not the cause of the disturbance. This disagreement simply highlights the need for a trial to determine the precise facts of this situation.

*Hazelwood* concerned a public school's decision to censor two articles slated for appearance in the school newspaper: one concerned pregnant students at the school, the other discussed the impact of divorce on students. The pregnancy story was rejected because the principal feared that in spite of the pseudonyms used in the article, the subjects might still be identified by the school community. The divorce story was rejected because it contained negative information about school parents and there was insufficient time to permit them to respond to the facts set out in the article. The Supreme Court rejected the newspaper staff members' suit on a number of bases: the school paper was not a public forum, publishing the paper was a school-sponsored activity that was part of an advanced journalism class, and readers would perceive articles appearing in the school paper as being "school-approved" publications. *Hazelwood*, 484 U.S. at 268-73. In addition, the Court recognized the competing privacy interests of the pregnant students and the families going through a divorce. *Id.* All of these factors combined to create a set of circumstances where the Court allowed the school officials to regulate student speech. For the purposes of our current inquiry, the most important part of the *Hazelwood* holding is the Court's description of when a school has greater authority

to regulate student speech (and the way *Tinker* differs from *Hazelwood*):

> [T]he standard articulated in *Tinker* for determining when a school may punish student expression need not also be the standard for determining when a school may refuse to lend its name and resources to the dissemination of student expression. Instead, we hold that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns. *Id.* at 272-73.

The Madison County School Board's actions cannot be judged using the more lenient *Hazelwood* standard because the special circumstances present in *Hazelwood* are so clearly absent in Madison County. Castorina and Dargavell's actions were not school sponsored, nor did the school supply any of the resources involved in their wearing the T-shirts. Most importantly, no reasonable observer could conclude that the school had somehow endorsed the students' display of the Confederate flag. As a result, *Tinker* is the most relevant of the three Supreme Court cases concerning school speech and sets forth the legal framework that the district court should apply to its factual findings. Using the *Tinker* standard that "silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of petitioners" is not subject to regulation, *Tinker*, 393 U.S. at 508, it is clear that a formal factual finding with respect to the disturbance -- if any -- caused by the plaintiffs' actions is necessary before a final decision can be entered in this case.

In addition, the two Court of Appeals decisions upholding suspensions for Confederate flag displays, *Melton v. Young*, 465 F.2d 1332 (6th Cir. 1972), and *West v. Derby Unified School District No.260*, 206 F.3d 1358 (10th Cir. 2000), satisfy *Tinker* in ways that the Madison County suspension does not. In *West*, junior high school student T.W. drew a