*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0025p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

DEREK BARR; ROGER CRAIG WHITE and
CHRIS WHITE, by and through their parent
and guardian ROGER WHITE,
　　　　　　　　　*Plaintiffs-Appellants*,

　　　　　*v.*

STEVE LAFON, in his individual and official
capacity as Principal of William Blount High
School; ALVIN HORD, in his official capacity
as Director of Schools; and THE BLOUNT
COUNTY SCHOOL BOARD,
　　　　　　　　　*Defendants-Appellees.*

No. 07-5743

Filed: January 23, 2009

Before: MOORE and CLAY, Circuit Judges; and SCHWARZER, District Judge.[*]

—————————————

## ORDER

—————————————

The court having received a petition for rehearing en banc, and the petition having been circulated not only to the original panel members but also to all other active judges of this court, and less than a majority of the judges having favored the suggestion, the petition for rehearing has been referred to the original panel.

The panel has further reviewed the petition for rehearing and concludes that the issues raised in the petition were fully considered upon the original submission and decision of the case. Accordingly, the petition is denied.

———————————————————————

[*] The Honorable William W Schwarzer, United States District Judge for the Northern District of California, sitting by designation.

BOGGS, Chief Judge, dissenting from the denial of rehearing en banc.  Prior to 1969, the ability of public school administrators to enforce their views of reasonable decorum with respect to political symbols was relatively uncontested.  In that year, however, the Supreme Court's decision in *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) established that students did not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."  *Id.* at 506.  In the case of a student wearing a black armband, apparently as an antiwar protest, the court held that such a display of ideas (however open to interpretation) was constitutionally protected, so long as disruption of school activities could not reasonably be forecast.  Absent evidence that certain expression "would substantially interfere with the work of the school or impinge upon the rights of other students," school authorities cannot prohibit it.  *Id.* at 509.

While this new policy certainly had costs and benefits, and purported to apply evenhandedly to all symbols and ideas, it carried within itself the seeds of two possible difficulties.  The first was whether schools and courts would export their degree of approbation of symbols into the degree to which they could "reasonably forecast" disruption.  The second was the extent to which the policy would sanction a "heckler's veto," in the sense that it appeared to make no distinction as to whether the forecast disruption was by supporters or opponents of the symbols.  Thus, in the *Tinker* case, the pacific response by any pro-war militants (even though, perhaps, angered  by the symbol in the face of the recent deaths in combat of local military personnel) upheld Ms. Tinker's rights, while it was unclear whether an aggressive response by pacifists to military paraphernalia would justify the suppression of such items.

These seeds have come to some fruition in a number of recent cases such as *Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166 (9th Cir. 2006), *cert. granted and vacated as moot*, 127 S. Ct. 1484 (2007) and *Guiles v.  Marineau*, 461 F.3d 320 (2d Cir. 2006), *cert. denied*, 127 S. Ct. 3054 (2007).

Our case arises in a somewhat novel posture.  In most cases under *Tinker,* court opinions have focused on what appeared to be an agreed-upon set of facts.  In our case, however, the key issue is the extent to which disputes over facts are being treated by conventional summary judgment standards.  In my view, as set forth below, were this an employment discrimination case or a tort dispute, let alone a case with the solicitude for careful examination of disputes of fact normally accorded First Amendment cases, this case would have gone to trial.  *See Hurley*

*v. Irish-Am. Gay, Lesbian & Bisexual Group*, 515 U.S. 557, 567-68 (1995) (on appeal, a reviewing court must undertake a "fresh examination of crucial facts . . . so as to assure ourselves that [the lower court's] judgment does not constitute a forbidden intrusion on the field of free expression"). The key issue is whether the school administrators, in the circumstances of this case, reasonably forecast disruption based on permitting students to display symbols associated with the Confederate States of America.

Instead, in my view, of looking at the facts in the light most favorable to the students, and drawing all reasonable inferences in favor of the students, the court rather uncritically accepts the school administrators' point of view. I will outline a number of ways in which a reasonable jury could find, under that standard, that the administrators' explanation was not based on a reasonable forecast of disruption, rather than, for example, a desire to avoid political and public controversy—a reason not sanctioned by *Tinker*.

1. The precipitating incident for the policy was a tussle between two students, one black and one white, which led to a parental complaint and an investigation by the Department of Education Office of Civil Rights. The tussle had nothing to do with any symbolism, and the investigation found that the school had not discriminated by punishing the black student as the instigator and not the white student, who was found not to have responded.

Nonetheless, public controversy was aroused.

2. Depositions by the administrators indicated their belief that the mere offensiveness of the Confederate flag to some students provided a sufficient basis for concluding it was disruptive and could be suppressed, or to use the words of one school representative, something that is offensive "will sooner or later" result in a disturbance. JA 115, 122-23. At times, these administrators went still further, suggesting any historic basis for being offended could justify the censorship of expression in general and the Confederate flag in particular. The Blount County Director of Schools, Alvin Lee Hord, answered in the affirmative when asked whether he would continue to support enforcement of the ban even if he became aware "the Confederate flag was no longer causing disruption." JA 123. And the Principal of William Blount High School

admitted history alone might indicate that certain speech was disruptive despite evidence the particular expression would no longer cause a disruption. JA 98.

3. The very thoroughgoingness of the speech suppression, it could be inferred, meant that the policy was based on offense at the symbols themselves, rather than actual fear of disruption. Thus, the record is clear that administrators suppressed not only what might be considered "in your face" tee shirts, but also armbands (the very basis of *Tinker*), belt buckles, automobile decals, and even a distribution of a local newspaper when it contained a symbol. In addition, administrators suppressed a tee shirt with no symbolism at all, but only a legend tweaking the policy itself: "You Can Make Me Change My Shirt, but You'll Never Change My Mind." JA 76.

4. With the above background, the more serious incidents relied on by the school, which could certainly justify a reasonable jury in concluding that disruption could reasonably be forecast, must be weighed to see whether a reasonable jury might also take the opposite point of view.

It should be emphasized that no disruption of any sort was directly associated with the display of symbols, in that the persons displaying the symbols are not alleged to have been involved in any physical incidents, nor to have instigated even any verbal ones. *Castorina ex rel. Rewt v. Madison County Sch. Bd.*, 246 F.3d 536, 544 (6th Cir. 2001) ("If the students' claims . . . that there were no prior disruptive altercations *as a result* of Confederate flags are found credible, the court below would be required to strike down the students' suspension as a violation of their rights of free speech as set forth in *Tinker*") (emphasis added). The court says that evidence of disruption is "uncontested," but the record suggests otherwise. *Barr v. Lafon*, 538 F.3d 554, 566 (6th Cir. 2008). I note that some of the "disruption" was based on administrative time responding to parental complaints. Consider also that one of the plaintiffs to this case, who was involved in a verbal confrontation with another student, testified that after he was called a "dumb redneck," he did not respond because "it's not worth my time beating somebody's butt because they're just acting stupid." JA 82. Though a confrontation short of a violent altercation could amount to a disruption within the meaning of *Tinker*, not every disagreement or incident of name-calling will support the suppression of speech. And it should be left to a jury to determine whether this disagreement both constitutes a disruption and was sufficiently related to the Confederate flag to justify a ban.

The more serious incidents referred to include bathroom graffiti of a graphic and obscene sort, the circulation of two supposed hit-lists, vague rumors that students were bringing guns to school, and the arrest of one student who allegedly told police he planned to pull the fire alarm and shoot people in the ensuing commotion. Although these events are all no doubt frightening, their relationship to the prohibited speech is subject to question. School officials could not identify students responsible for the vandalism with anyone on either side of the dispute; they could not say the so-called hit-lists targeted members of racial minority groups or students of any particular race; and they did not testify that the student in custody threatened any particular ethnic group as opposed to an act of random violence. Indeed, Director Hord stopped short of saying in his deposition the Confederate flag would "substantially interfere" with the work of the school. Rather, he said the flag was "hurtful to some people" and that he personally thought it was disruptive. JA 115. Even the testimony of school authorities does not paint the picture of a robust threat to the educational mission that would justify (on summary judgment) a ban on political expression. And whatever the record shows about racial animus in Blount County, it does not contain any evidence that even purports to demonstrate that t-shirts merely opposing the school's policy, that do not depict the Confederate flag or any other racially divisive symbols, would substantially interfere with the school's educational mission.

On these facts, in my view, a reasonable jury could draw one of two conclusions. It could conclude, as our court apparently did and the administrators alleged that they did, that any display of Confederate symbolism or of opposition to the school policy could lead to disruption (though it is unclear the extent to which this "disruption" included the disruption for the administrators caused by having to respond to public outrage at the display, which certainly occurred in *Tinker* as well).

On the other hand, a reasonable jury could conclude that the incidents relied on were not sufficiently serious, or not sufficiently tied to any student speech, that disruption *from display of the symbols* could reasonably be forecast. The jury could conclude instead that the administration, as school administrators sometimes do, was simply trying to prevent public outrage, and that it was easier (or perhaps more in line with their own political views) to suppress the students rather than to uphold the constitutional promise of *Tinker*.

Under these circumstances, I believe that significant First Amendment principles (as established in *Tinker*) are at stake and that rehearing en banc is warranted. If *Tinker* is to remain the law, it should not be used as a sword for some expression but as a shield for those who would

suppress some unpopular opinions.  I therefore respectfully dissent from the denial of rehearing en banc.


ENTERED BY ORDER OF THE COURT


/s/ Leonard Green
_____
                    Clerk