*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0305p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DEREK BARR; ROGER CRAIG WHITE and CHRIS
WHITE, by and through their parent and guardian
ROGER WHITE,

            *Plaintiffs-Appellants*,

    *v.*

STEVE LAFON, in his individual and official capacity
as Principal of William Blount High School; ALVIN
HORD, in his official capacity as Director of
Schools; and THE BLOUNT COUNTY SCHOOL BOARD,
            *Defendants-Appellees.*

No. 07-5743

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 06-00075—Thomas A. Varlan, District Judge.

Argued: April 22, 2008

Decided and Filed: August 20, 2008

Before: MOORE and CLAY, Circuit Judges; SCHWARZER, District Judge.[*]

---

## COUNSEL

**ARGUED:** Van R. Irion, LAW OFFICES OF VAN R. IRION, Knoxville, Tennessee, for
Appellants. LaJuana G. Atkins, CRAWFORD, CRAWFORD & NEWTON, Maryville, Tennessee,
for Appellees. **ON BRIEF:** Van R. Irion, LAW OFFICES OF VAN R. IRION, Knoxville,
Tennessee, for Appellants. LaJuana G. Atkins, Norman H. Newton, Jr., CRAWFORD,
CRAWFORD & NEWTON, Maryville, Tennessee, Robert N. Goddard, GODDARD & GAMBLE,
Maryville, Tennessee, Gary M. Prince, O'NEIL, PARKER & WILLIAMSON, Knoxville,
Tennessee, for Appellees.

---

[*]The Honorable William W Schwarzer, United States District Judge for the Northern District of California,
sitting by designation.

1

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge.  Derek Barr, Roger Craig White, and Chris Nicole White ("Plaintiffs-Appellants"), students at William Blount High School ("the school") in Blount County, Tennessee, would like to express their southern heritage by wearing clothing depicting the Confederate flag at school.  They appeal the district court's grant of summary judgment to the principal of their school, Steven Lafon ("Lafon"), the director of the Blount County schools, Alvin Hord ("Hord"), and the Blount County School Board[1] on their First Amendment, Equal Protection Clause, and Due Process Clause claims.

## I.  FACTS AND PROCEDURE

### A.  Factual Background

#### 1.  Written Dress Code

The Blount County Board of Education issued a dress code on December 4, 2003 in recognition of "the effect that student dress and grooming have upon student behavior and learning." Joint Appendix ("J.A.") at 155 (Hord Aff. Ex. 1 at 1).  Among other prohibitions, the dress code bars middle- and high-school students from wearing during the school day:

> clothing which exhibits written, pictorial, or implied references to illegal substances, drugs or alcohol, negative slogans, vulgarities, *or causes disruption to the educational process*; wearing apparel that is sexually suggestive or that features crude or vulgar commercial lettering or printing and/or pictures that depict drugs, tobacco, alcohol beverages, racial/ethnic slurs or gang affiliation . . . .

J.A. at 156 (Hord Aff. Ex. 1 at ¶ 4(f)) (emphasis added).  On the first day of the 2005-2006 school year, in keeping with school policy, students attended a meeting at which they received a "[p]lanner" containing an agenda and school rules.  Students' home-room teachers reviewed the planner with them, and the school asked both parents and students to sign a page of the planner indicating that they had read the policy.  J.A. at 102 (Lafon Dep. at 26:19-27:7).

#### 2.  Announcement of the Ban on Clothing Displaying the Confederate Flag

At an assembly for the freshman class in August 2005, Principal Lafon told the class that "they would not be allowed to have Rebel flags or symbols of [the] Rebel flag on their clothing, or anything else that was a disruption to the school."  J.A. at 102 (Lafon Dep. at 28:10-12).  Lafon testified at his deposition that he did not mention any other flags as similarly banned because there were not "any other flags at that point that were causing disruption or that we knew had caused a disruption in the previous year."  J.A. at 102 (Lafon Dep. at 28:17-23).  Lafon told the students that "in general . . . anything that is a disruption to the school learning environment would not be tolerated."  J.A. at 103 (Lafon Dep. at 29:5-9).

---

[1]Plaintiffs-Appellants brought suit against Lafon in his individual and official capacities.  Plaintiffs-Appellants brought suit against Hord only in his official capacity.  Defendants-Appellees are collectively referred to as "the Board" throughout the opinion.

### 3. Rationale for the Ban on the Confederate Flag and Racially Divisive Symbols

According to Hord, racial tensions at the school comprised the context for the clothing ban. Relevant incidents included racist graffiti that made general threats against the lives of African-Americans, graffiti containing "hit lists" of specific students' names, physical altercations between African-American and white students, and a police lockdown at the school. J.A. at 53-54 (Hord Aff. 3/10/06 at ¶¶ 3-4); J.A. at 111, 113-14, 115-16 (Hord Dep. at 17-18, 25-31, 36-39). Hord attests that "[b]ased upon the aforementioned incidents, the wearing of the 'Confederate flag' by students during school hours has a significant disruptive effect on the proper educational environment of the students at the Blount County high school." J.A. at 54 (Hord Aff. 3/10/06 at ¶ 5). Of the approximately 1,750 students attending the school, less than ten percent are African-American. J.A. at 153 (Hord Aff. 4/3/07 at ¶ 10).

### a. February 22, 2005 Altercation and other Altercations

Both sides in the instant case cite an incident that occurred on February 22, 2005 as the catalyst of heightened racial tension in the school. Barr recounted his observation of the incident. According to Barr, the incident involved a physical altercation at a basketball game in the gym, between an African-American student (whose name Barr did not know) and a Caucasian student named J.H. J.A. at 235 (Barr Dep. at 8:12-20). Barr did not remember exactly what the argument was about. J.A. at 235 (Barr Dep. at 8:21-23). Barr indicated that a third "racist" white student named C.P. "didn't like what the African-American kid was saying, and they got into it." J.A. at 235-36 (Barr Dep. at 8:24-9:3). The African-American student rounded up a group of friends, and Barr joined a "couple of other kids . . . because [J.H.] was our friend and we didn't want to see him getting jumped by anybody." J.A. at 236 (Barr Dep. at 9:3-9). Before a physical altercation began, "the teachers and everybody got down there and split them up and everything like that and told them to go to class. And from then on there was a tight racist thing going on in the school." J.A. at 236 (Barr Dep. at 9:10-13). Barr testified that by "tight racist thing," he meant that the African-American students "tried to find anything they could to get" Caucasian students "in trouble." J.A. at 236 (Barr Dep. at 9:15-20).

The incident resulted in the parent of the African-American student involved in the February 22 altercation, whom the school suspended, filing a complaint with the Office of Civil Rights ("OCR") at the Department of Education alleging that the complainant's son received harsher discipline than a white student who did not receive a suspension. J.A. at 111 (Hord Dep. at 17-18); J.A. at 289 (OCR Letter at 1). OCR investigated the incident and concluded "that the witnesses did not substantiate the allegations that Student #2 [a Caucasian student] engaged in fighting. All witnesses stated that Student #2 had not pushed back when Student #1 pushed him into the bleachers." J.A. at 291 (OCR Letter at 3).[2] Furthermore, OCR concluded although "[t]he complainant reported that the two [Caucasian] HHS students threatened, used racial slurs or intimidating conduct (noose gestures) against [her son, African-American] Student #1[,] . . . that allegation was not corroborated by witnesses." *Id.*

In addition to the February 22 incident, Hord attests that the school experienced "multiple racially motivated threats and physical altercations," but Hord does not specifically describe other

---

[2]The OCR report states that Student #2 attended Heritage High School and not William Blount High School. J.A. at 289 (OCR Letter at 1). Both Heritage and William Blount High Schools, however, lie within the Blount County School District and both are subject to the district's policies regarding discrimination and harassment. J.A. at 290 (OCR Letter at 2). OCR did not find material to its investigation the fact that students #1 and #2 attended different high schools. Moreover, it is possible that OCR received misinformation from William Blount High School regarding which high school Student #2 attended. Barr's testimony at deposition implies that all students involved in the February 22 altercation attended William Blount High School. JA. at 70-71 (Barr. Dep. at 8:4-9:22).

physical altercations. J.A. at 53 (Hord Aff. 3/10/06 at ¶ 3(b)). Hord mentioned at his deposition an incident in January 2005 involving a mixed-race step team that he believed contributed to racial tensions at the school. J.A. at 111 (17:7-16).

### b. Racist Graffiti and "Hit Lists"

In the spring of 2005, the school experienced multiple incidents of racist graffiti and graffiti containing "hit lists" with students' names. On March 23, 2005, School Resource Officer and Deputy Sheriff Joe Crisp investigated graffiti in the girls' restroom after an Assistant Principal at the school contacted him. J.A. at 183 (Crisp Aff. at ¶ 2). He did not take pictures because the custodians had painted over the graffiti before he arrived; however, he filed an incident report with the Sheriff's Office. J.A. at 183 (Crisp Aff. at ¶ 2). According to his report, the Assistant Principal told him that the phrase "all niggers must die" was accompanied by a list with future victims' names. J.A. at 188 (Incident Report).

Another incident involving racist graffiti occurred on April 1, 2005; the principal of the school contacted Crisp to ask him to investigate racial remarks on a restroom stall. J.A. at 183 (Crisp Aff. at ¶ 3). Crisp took pictures, J.A. at 377-384 (Photographs), and filed an incident report. J.A. at 183 (Crisp Aff. at ¶ 3); J.A. at 191 (Incident Report). Four days later, on April 5, 2005, Crisp took photographs of graffiti in a boys' restroom, J.A. at 202; the graffiti stated: "All niggers will still die on 4-13-05[.] It's time for a new revolution[.] KKK." J.A. at 184 (Crisp Aff. at ¶ 4); J.A. at 386 (Crisp Aff. Ex. 4). Deputy Sheriff Andy Waters took photographs of the graffiti in a boys restroom in the vocational wing of the school. J.A. at 392-411 (Photographs); J.A. at 206 (Investigative Report). The graffiti included the scrawled statements: "The South Will Rise Again," J.A. at 398-99 (Waters Aff. Ex. 2), and "Niggers 'Hang em,'" written above a drawing of a noose next to the Confederate flag. J.A. at 404-09 (Waters Aff. Ex. 2).

The graffiti included a "hit list" with students' names. J.A. at 113-14 (Hord Dep. at 25-31); J.A. at 367 (Crisp Aff. at ¶ 2); J.A. at 369-72 (Crisp Aff. Ex. 1). Hord testified that he was not certain whether all the names on the list were those of minority students. J.A. at 114 (Hord Dep. at 29). Deputy Sheriff David Henderson stated in his report that the graffiti threatened "rednecks" as well as African-Americans. J.A. at 231 (Henderson Report). Plaintiff-Appellant Barr testified that the list was on paper and was shown to various students. J.A. at 238 (Barr Dep. at 11:19-24). Barr testified that "it wasn't just Caucasian kids doing it." J.A. at 238 (Barr Dep. at 11:7-8). He testified that he knew "a lot" of the people on the list, some Caucasian and some African-American. J.A. at 239 (Barr Dep. at 12:2-7).

### c. Lockdown

After a meeting with representatives from the Sheriff's Department and an FBI agent, Hord decided to implement a lockdown at the school in early April 2005[3] to "be proactive" and "show that the school [was] secure and it [was] safe and we [were] interested in keeping it that way." J.A. at 54 (Hord Aff. 3/10/06 at ¶ 4); J.A. at 115 (Hord Dep. at 36:20-22); J.A. at 117-18 (Hord Dep. at 44:24-45:2) (reiterating the need to demonstrate that the school was safe and free of guns). Hord pointed out that there had been "threats to bring guns, to hang people, to do all of this stuff. I had been accused by some people of not taking this serious[ly]." J.A. at 115 (Hord Dep. at 36:17-19). One parent Hord remembered in particular, John Cleveland, called Hord because his daughter had been called racially derogatory names, threatened because of her race, and "exposed to being taunted by the [Rebel] flag or something to that nature." J.A. at 116 (Hord Dep. at 40:4-7, 20). Hord was concerned about violence. J.A. at 116 (Hord Dep. at 37:15-16).

---

[3]Lafon was a teacher at the school at this time; he assumed the principalship in the summer of 2005. J.A. at 97 (Lafon Dep. at 6:18-20); J.A. at 120 (Hord Dep. at 53:21-25).

The Sheriff's Office "maintained a continued presence," J.A. at 228 (Henderson Aff. at ¶ 3), at the school on April 7-8, 2005. The office assigned "approximately 40-50 officers" "to secure" the high school and "investigate racial incidents." J.A. at 228 (Henderson Aff. at ¶ 3). Officer Waters "checked purses and backpacks at the school entrance as part of the security assigned" to the school. J.A. at 204 (Waters Aff. at ¶ 3). "The investigation did not reveal any suspects for the graffiti, racial threats[,] or racial slurs." J.A. at 184 (Crisp Aff. at ¶ 5). One student, J.H., "was charged and delivered to the Blount County Juvenile Detention Center after he admitted that he stated that he and his friends were going to bring a gun to school and kill all African American students and other people they did not like." J.A. at 184 (Crisp Aff. at ¶ 5).

### d. Hord's Conclusions Regarding the Disruptive Effect of the Confederate Flag

Hord attests that in making the decision to ban the Confederate flag and other "racially divisive symbols," he "relied upon numerous conversations with students and parents of students which revealed that students were taunted by the Confederate flag and were fearful for their safety as a result of the racial tensions at William Blount High School." J.A. at 152 (Hord Aff. 4/3/07 at ¶ 5). Hord further attests that "[t]he parents' and the students' fears were evidenced by a dramatic increase in absenteeism during the time of racial tension prior to the lockdown and the ban." *Id.*

Hord characterized the Confederate flag as both offensive and disruptive: "I think when that offense becomes something that you have to deal with day-in and day-out [] it is disruptive to what our normal process is, yes." J.A. at 115 (Hord Dep. at 34:6-8); *see also* J.A. at 112 (Hord Dep. at 21:7-16). Hord believed that student offense as a result of the flag would lead to disruption. J.A. at 122-23 (Hord Dep. at 64:18-65:2). Hord stated that he was not banning the Confederate flag because it was a "racist symbol": he based the continued ban on the events that began in January 2005 and information that he continues to gain

> that says to me, when you have it, you have disruption, you have—you have interference with the learning process. And you have hurt feelings and you have people that are offended and it is something that we have to deal with. My primary purpose is to take us forward instructionally and that prohibits that and you're worried about the insecurity and safety and all of those things rather than the instruction process.

J.A. at 115 (Hord Dep. at 33:5-16). Lafon believed that were the ban lifted, the Confederate flag "would be a source of confrontation and a symbol that would cause unrest with the student body." J.A. at 99 (Lafon Dep. at 14: 19-20). Lafon also believed that the presence of the flag would lead to racially motivated physical altercations. J.A. at 99 (Lafon Dep. at 14:23-24). Hord, however, stated in his deposition that he intended "at this point" to keep the ban in place, even if appearances of the Confederate flag (despite the ban) did not cause disruption. J.A. at 121 (Hord Dep. at 59:9-60:10).

### 4. Enforcement of the Ban on Racially Divisive Symbols

According to Lafon, between August 2005 and March 2006, the school witnessed "over 452 documented violations of the dress code policy . . . twenty-three (23) of which involved the wearing of the 'Confederate flag' by students." J.A. at 51 (Lafon Aff. at ¶ 4). Plaintiff-Appellant Barr declares:

> On or about September 1, 2005, to express pride in my southern heritage, I wore a T-shirt to school bearing a small image of the Confederate flag, a picture of two dogs, and the words "Guarding our Southern Heritage" on the back. I was confronted by Defendant Lafon. Prior to my encounter with Mr. Lafon, no student or teacher had commented on my shirt that day. I was informed by Mr. Lafon that

> items displaying the Confederate flag were banned at William Blount High School. Defendant Lafon informed me that I had to turn the shirt inside out or take it off. Lafon informed me that if I refused to remove the shirt I would be suspended from school.

J.A. at 26-27 (Barr Decl. at ¶ 4). Plaintiff-Appellant Chris White declares that she "wore a shirt with an image of the Confederate flag to school" in January 2006. J.A. at 24 (Chris White Decl. at ¶ 4).[4] A teacher told Chris White "that the shirt violated school policy because of the image of the flag." J.A. at 24-25 (Chris White Decl. at ¶ 4). The teacher told Chris White "to cover the shirt with a jacket for the rest of the day or return home and be suspended." J.A. at 25 (Chris White Decl. at ¶ 4). We note that the declarations of Derek Barr and Chris White contained in the joint appendix are unsigned.

## B. Procedural Background

On February 21, 2007, a panel of this court affirmed the district court's denial of Plaintiffs-Appellants' motion for a preliminary injunction in an unpublished opinion. *D.B. ex rel. Brogdon v. Lafon*, 217 F. App'x 518 (6th Cir. 2007) (unpublished) (per curiam). Plaintiffs-Appellants filed a motion for summary judgment as to their Equal Protection Clause claim on February 10, 2007. The Board filed a motion for summary judgment on April 5, 2007. In an oral ruling on May 24, 2007, the district court denied Plaintiffs-Appellants' motion for summary judgment and granted the Board's motion, which it treated as addressing all of the claims in the Complaint (First Amendment, Equal Protection, and Due Process). J.A. at 33-44. The district court formally entered judgment in a one-page order on May 31, 2007, dismissing the case with prejudice.

## II. ANALYSIS

## A. Standard of Review

We review de novo the district court's grant of summary judgment to the school. *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 700 (6th Cir. 2007) (citing *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006)). Summary judgment for the school is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In contrast, "[s]ummary judgment is inappropriate when the evidence raises a genuine issue about a material fact, 'that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Wright*, 455 F.3d at 706 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). We "view all evidence in the light most favorable to the nonmoving party." *Clay*, 501 F.3d at 701. We must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. We do not "weigh the evidence and determine the truth of the matter but [rather we] determine whether there is a genuine issue for trial." *May v. Franklin County Comm'rs*, 437 F.3d 579, 583 (6th Cir. 2006) (quoting *Anderson*, 477 U.S. at 249). "[T]here can be 'no genuine issue as to any material fact'" when the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that

---

[4] The declaration is titled "Declaration of C.W." We assume that the declaration is by Plaintiff-Appellant Chris Nicole White and not Plaintiff-Appellant Roger Craig White because the declaration in one sentence refers to the author of the declaration in the third person, rather than the first person, using the pronoun "she." J.A. at 25 (Chris White Decl. at ¶ 4). In addition, the caption for the district court opinion in this case referred to Plaintiffs-Appellants as D.B., R.W., and C.W. We therefore deduce that R.W. referred to Roger Craig White and C.W. to Chris Nicole White. J.A. at 45 (5/31/2007 Order).

party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Plaintiffs-Appellants also appeal the district court's denial of their motion for summary judgment. "Although the denial of a motion for summary judgment is usually an interlocutory order that is not immediately appealable, where 'an appeal from a denial of summary judgment is presented in tandem with a grant of summary judgment, this court has jurisdiction to review the propriety of the district court's denial of summary judgment.'" *Tenn. ex rel. Wireless Income Props., LLC v. City of Chattanooga*, 403 F.3d 392, 395 (6th Cir. 2005) (quotations omitted). Because the district court denied Plaintiffs-Appellants' motion for summary judgment "'on purely legal grounds' . . . [and not] based on the finding of a genuine issue of material fact," we review the district court's denial de novo. *Id.* at 395-96 (quoting *McMullen v. Meijer, Inc.*, 355 F.3d 485, 489 (6th Cir. 2004)). We review de novo decisions on mixed questions of law and fact. *Wolfe v. Perry*, 412 F.3d 707, 716 (6th Cir. 2005).

## B. Plaintiffs-Appellants' First Amendment Claim

### 1. Precedent Relevant to Student Speech in Public Schools

Plaintiffs-Appellants' claims lead us to wrestle with a most difficult question: how to balance some students' rights to free speech with "the rights of other students to be secure and to be let alone," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969), taking into account the authority of school officials to maintain the discipline and learning environment necessary to accomplish the school's educational mission. The district court granted the Board's motion for summary judgment on Plaintiffs-Appellants' First Amendment and Equal Protection claims because the Confederate flag did not need to have caused a disruption in the past in order for school officials to ban it when (1) there were racially motivated incidents at the school that caused tension among the student body and (2) such a ban was not implemented in a viewpoint-discriminatory manner. J.A. at 35 (Tr. at 92:17-23); J.A. at 38 (Tr. at 95:6-9); J.A. at 41 (Tr. at 98:3-14). We affirm the district court's grant of summary judgment to the Board.

The Supreme Court has made "clear that students do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Morse v. Frederick*, ---U.S.---, 127 S. Ct. 2618, 2622 (2007) (quoting *Tinker*, 393 U.S. at 506). "[T]he constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986), and courts must apply the rights of students "in light of the special characteristics of the school environment." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (quoting *Tinker*, 393 U.S. at 506).

In *Tinker*, the Court considered whether a public school district violated high-school and junior-high-school students' First Amendment rights when the district suspended students who had worn black armbands to school as an expression of their opposition to the Vietnam War. The school had implemented a ban on the wearing of armbands after learning of some students' plans to protest the war by wearing black armbands during the holiday season in December 1965. The Court determined that because "the wearing of armbands . . . was entirely divorced from actually or potentially disruptive conduct by those participating in it," the wearing of the armbands "was closely akin to 'pure speech.'" *Tinker*, 393 U.S. at 505-06. The Court also determined that there existed no evidence that the suspended students' protest interfered "with the rights of other students to be secure and to be let alone" and, accordingly, that the case did "not concern speech or action that intrude[d] upon the work of the schools or the rights of other students." *Id.* at 508. The Court concluded that the school's ban on armbands was motivated by "an urgent wish to avoid the controversy which might result from the expression." *Id.* at 510. Because of the absence of "evidence that the school authorities had reason to anticipate that the wearing of the armbands would

substantially interfere with the work of the school or impinge upon the rights of other students," the Court reversed the en banc court of appeals decision below affirming the district court's dismissal of the plaintiffs-students' complaint. *Id.* at 509, 514.

In two subsequent cases, the Court qualified when the *Tinker* standard should be applied and clarified that schools did not in every situation need to justify regulation of student speech on the basis that the speech would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Tinker*, 393 U.S. at 509 (quotation omitted). In *Bethel School District No. 403 v. Fraser*, the Court considered whether a public high school infringed upon a student's free-speech rights when the school suspended the student for violating a school policy that prohibited "the use of obscene, profane language or gestures." 478 U.S. at 678. The suspended student had given a speech at a school-sponsored assembly, in support of another student's candidacy for elective office, which employed "an elaborate, graphic, and explicit sexual metaphor." *Id.* at 677-78. The Court noted "[t]he marked distinction between the political 'message' of the armbands in *Tinker* and the sexual content of the respondent's speech in [*Fraser*]," *id.* at 680, and observed that prior Court decisions had allowed limitations on speech in the interest of protecting children, especially those in captive audiences, from sexually explicit, vulgar, and offensive spoken language. *Id.* at 684. Accordingly, the Court held that "schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech and conduct such as . . . Fraser's . . . plainly offensive [speech.]" *Id.* at 683.

*Hazelwood School District v. Kuhlmeier* involved a suit brought by former staff members of a high-school newspaper who argued that the school principal violated their First Amendment rights when he deleted two pages of the newspaper containing articles discussing students' experiences of pregnancy and the effect of divorce on students. The Court concluded that because the school lent its name and resources to the newspaper, the *Tinker* standard did not apply to the case. *Hazelwood*, 484 U.S. at 272-73. The Court held "that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273.

The above trilogy of cases yields three principles: (1) under *Fraser*, a school may categorically prohibit vulgar, lewd, indecent, or plainly offensive student speech,[5] *Fraser*, 478 U.S. at 683-85; *Hazelwood*, 484 U.S. at 272 n.4; (2) under *Hazelwood*, a school has limited authority to censor school-sponsored student speech in a manner consistent with pedagogical concerns, 484 U.S. at 273; and (3) the *Tinker* standard applies to all other student speech and allows regulation only when the school reasonably believes that the speech will substantially and materially interfere with schoolwork or discipline, 393 U.S. at 513. *Guiles*, 461 F.3d at 325; *Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166, 1176-77 (9th Cir. 2006), *vacated on other grounds*, --- U.S. ---,127 S. Ct. 1484 (2007); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 214 (3d Cir. 2001); *see also Castorina ex rel. Rewt v. Madison County Sch. Bd.*, 246 F.3d 536, 540 (6th Cir. 2001).

*Tinker* governs the instant case because by wearing clothing depicting images of the Confederate flag students engage in pure speech not sponsored by the school. *Castorina*, 246 F.3d at 539-40. *Hazelwood* does not apply to the instant case "because no one would reasonably believe that [Plaintiffs-Appellants' clothing] bore the school's imprimatur." *Morse*, 127 S. Ct. at 2627. Therefore, our inquiry in this case is whether the ban on clothing depicting the Confederate flag "is

---

[5]"Plainly offensive" speech, proscribable under *Fraser*, "should not be read to encompass any speech that could fit under some definition of 'offensive,' . . . [as] much political and religious speech might be perceived as offensive to some." *Morse*, 127 S. Ct. at 2629.

necessary to avoid material and substantial interference with schoolwork or discipline." *Tinker*, 393 U.S. at 511.

The Court's most recent student-speech case, *Morse v. Frederick*, does not modify our application of the *Tinker* standard to the instant case. *Morse* affirmed that "schools may regulate some speech even though the government could not censor similar speech outside the school" and that the rule stated in *Tinker* "is not the only basis for restricting student speech." 127 S. Ct. at 2627 (internal quotation omitted). The *Morse* decision, however, resulted in a narrow holding: a public school may prohibit student speech at school or at a school-sponsored event during school hours that the school "reasonably view[s] as promoting illegal drug use." *Id.* at 2629. Justice Alito's concurrence states that he joins the majority opinion "on the understanding that (a) it goes no further than to hold that a public school may restrict speech that a reasonable observer would interpret as advocating illegal drug use and (b) it provides no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue." *Id.* at 2636 (Alito, J., concurring). Justice Alito also makes clear that he joins the majority only insofar as "the opinion does not hold that the special characteristics of the public schools necessarily justify any other speech restrictions" beyond those articulated in *Tinker*, *Fraser*, and *Hazelwood*. *Id.* at 2637.

## 2. Analysis under *Tinker* of the Ban on Clothing Depicting the Confederate Flag

As an initial matter, we must consider Plaintiffs-Appellants' argument that much of the evidence presented by the Board, and relied upon by the district court, was hearsay. Plaintiffs-Appellants Br. at 33-37; Reply Br. at 17-21. As the Board notes, however, Plaintiffs-Appellants do not specify in their brief which evidence they consider to be hearsay; rather, Plaintiffs-Appellants refer us to documents filed at the district court level. Plaintiffs-Appellants Br. at 33 n.6. Well-established law in this Circuit holds that "a party is not allowed to incorporate by reference into its appellate brief the documents and pleadings filed in the district court." *Thomas M. Cooley Law Sch. v. Am. Bar Ass'n*, 459 F.3d 705, 710 (6th Cir. 2006) (citing *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 452 (6th Cir.2003)), *cert. denied*, --- U.S. ---, 127 S. Ct. 985 (2007). Therefore, we are left with only Plaintiffs-Appellants' allegation that "[m]ost of the defendants' evidence in the case at bar consists of hearsay statements that were [inappropriately] considered 'for its[] effect upon the listener.'" Plaintiffs-Appellants Br. at 34. Because Plaintiffs-Appellants do not specify to which pieces of evidence they are referring, we have no basis upon which to conclude that the district court abused its discretion when it found that "in the record before the Court many of the declarants do, in fact, testify as to occurrences and incidents of which they have personal knowledge as that term would be defined and understood pursuant to the Federal Rules of Evidence." J.A. 39 (5/24/07 Hr'g Tr. at 96:19-22). *See United States v. Khalil*, 279 F.3d 358, 363 (6th Cir. 2002) (holding that "all evidentiary rulings of the district court, including its determination of whether testimony is inadmissible hearsay, are reviewed for abuse of discretion").

Plaintiffs-Appellants argue that there is no evidence "that the Confederate flag *ever* caused *any* disruption at the school," even when worn by students during the ban. Plaintiffs-Appellants Br. at 28. Plaintiffs-Appellants' contention that the Confederate flag itself had to cause disruption in the past for the school to justify the ban, however, "misapplies the *Tinker* standard." *Lowery v. Euverard*, 497 F.3d 584, 591 (6th Cir. 2007). "*Tinker* does not require disruption to have actually occurred." *Id.* at 593. Rather than evaluating competing claims about whether disruption occurred in the past, we "must evaluate the circumstances to determine if [the school's] forecast of substantial disruption was reasonable." *Id.* The rationale for this standard lies in the fact that requiring evidence of disruption caused by the banned speech would place "school officials . . . between the proverbial rock and hard place: either they allow disruption to occur, or they are guilty of a constitutional violation." *Id.* at 596. "Recognizing that the *Tinker* decision does not require that the banned form of expression itself actually have been the source of past disruptions, subsequent appellate court decisions considering school bans on expression have focused on whether the banned

conduct would likely trigger disturbances such as those experienced in the past." *Brogdon*, 217 F. App'x at 525 (citing *Castorina*, 246 F.3d at 542; *Melton v. Young*, 465 F.2d 1332 (6th Cir. 1972), *cert. denied*, 411 U.S. 951 (1973)). Our inquiry, then, is whether the school reasonably forecast that the Confederate flag would cause material and substantial disruption to schoolwork and school discipline.

Plaintiffs-Appellants further challenge the alleged high level of racial tension at the school, no matter the cause. In particular, Plaintiffs-Appellants allege that "[t]he racial graffiti referred to by the defendants as proof of 'racial tension' actually caused absolutely no disruptions, implying that racial tension is not as high as claimed." Plaintiffs-Appellants Br. at 29. Were Plaintiffs-Appellants correct and the record showed minimal evidence of prior disruption related to racial tension, then we would likely conclude that the school had little basis for anticipating disruption caused by images of the Confederate flag. But the evidence on the record belies Plaintiffs-Appellants' argument.

In deposing Hord, the attorney for Plaintiffs-Appellants tried to show that racist graffiti had not specifically caused disruption. When asked if he knew if any classes had been disrupted as a result of the graffiti, Hord stated that "[t]he only disruption I think it does have is that just by the fact that a Principal and teachers if they have those kids they are pulling kids out questioning them there, they are trying to get to the bottom of it. So in that sense it is a disruption, but I don't know specifically here is the class, here is the kids, that kind of thing." J.A. at 114 (Hord Dep. at 31:15-21). Hord stated that he did not know whether any fights resulted from the graffiti or "hit lists." J.A. at 114 (Hord Dep. at 31:3-12). We are wary of concluding, however, that the racist graffiti had to cause violent disruption to the school for the school reasonably to forecast that images of the Confederate flag would cause disruption within the meaning of *Tinker*. There is no requirement that disruption under *Tinker* be violent. Hord presents uncontested testimony that investigation of the graffiti disrupted classes. Furthermore, the racist graffiti was violent in character: the graffiti contained examples of the most demeaning racial slurs, accompanied by threats against the lives of African-Americans generally, an image of a noose next to that of a Confederate flag, and "hit lists" containing specific students' names. One might plausibly argue that such racist graffiti containing violent threats is inherently disruptive to a school environment. We do not need to reach such a conclusion today, however, because Hord presented evidence that the racist graffiti including the hit lists produced secondary disruptions. "There was a lot of school disruption because of the hit lists, parents coming to school, parents calling me, calling the administrator, calling people in the Central office and it was time consuming." J.A. at 114 (Hord Dep. at 30:24-31:2). Hord also gave unrefuted deposition testimony that fear of racial violence caused an increase in absenteeism among African-American students, the epitome of disruption in the educational process.

Perhaps the most compelling evidence of the racial tension that existed at the school immediately prior to the clothing ban comes from Plaintiffs-Appellants' own deposition testimony. Barr stated that he felt "friction" and "racially related tension" in the school in the spring of 2005. J.A. at 240 (Barr Dep. at 13:11, 13). He said he could "feel the intensity" as "people walk[ed] by." J.A. at 240 (13:8-9). Craig White, another student bringing this suit, conceded in his deposition that his Confederate flag clothing could "create disruptive behavior" at school if others found his clothing "offensive." J.A. at 261 (R. Craig White Dep. at 8:11-14).

The instant case can be distinguished from *Tinker*. In *Tinker* there were no facts in the record that would "reasonably have led school authorities to forecast substantial disruption of or material interference with school activities, and no disturbances or disorders on the school premises in fact occurred" as a result of students wearing black armbands in protest of the Vietnam War. 393 U.S. at 514. The facts in this case, however, even when viewed in a light most favorable to Plaintiffs-Appellants, indicate that school officials could reasonably forecast that permitting students to wear clothing depicting the Confederate flag would cause disruptions to the school environment.

In contrast to the dearth of evidence on the record in *Tinker*, the record in the instant case contains evidence of racial violence, threats, and tensions: a fight between an African-American and a white student on February 22;[6] a complaint filed with OCR alleging that following a racially motivated altercation, the school punished an African-American student more harshly than a white student in the district was punished; racist graffiti containing racial slurs and generalized threats against the lives of African-Americans; "hit lists" containing student names; unspecified race-related physical fights during the 2004-2005 school year; a fear-motivated increase in absenteeism among African-American students; and a school "lockdown" in April 2005 that the school implemented because of a breakdown in student discipline and the threat of race-related violence. Notably, a particularly egregious example of racist graffiti depicted the Confederate flag next to a drawing of a noose, just below a general threat to the lives of African-Americans that contained a racial slur. J.A. at 406-09 (Waters Aff. Ex. 2). That graffiti exemplifies how school officials reasonably concluded that the connection between the symbolism of the Confederate flag and racial tensions at the school meant that the Confederate flag would likely have a disruptive effect on the school. Under *Tinker*, we hold that the school reasonably forecast that clothing bearing images of the Confederate flag would disrupt schoolwork and school discipline.

We do not find persuasive Plaintiffs-Appellants' argument that the Board has "repeatedly admitted that prevention of disruption is not [its] only motive." Appellant Br. at 27. Hord acknowledges that the disruption he anticipates arising from displays of the Confederate flag directly correlates with the offense the flag poses to some students. Hord stated at deposition: "I think when that offense becomes something that you have to deal with day-in and day-out [then] it is disruptive to what our normal process is, yes." J.A. at 115 (Hord Dep. at 34: 6-8). That Hord determined the Confederate flag to be *offensive* to African-American and other students, however, does not negate his reasonable belief that the flag was also *disruptive* and would cause substantial and material *interference* with schoolwork and school discipline. This is not a case in which the school acted upon "undifferentiated fear or apprehension of disturbance." *Tinker*, 393 U.S. at 508. The school did not merely find the Confederate flag offensive to some students but rather found that in a context of high racial tensions, race-related altercations, and threats of violence, the flag would disrupt the school's educational process.

That there exists a relationship between the offensiveness of the Confederate flag, in the eyes of some students, and its disruptive potential does not change our holding. We note that our decision evinces greater sensitivity to the effect of the regulated speech on its student audience than that ordinarily accorded to the targets of speech in our general First Amendment jurisprudence. First Amendment standards applicable to student speech in public schools, however, are unique, and courts accord more weight in the school setting to the educational authority of the school in attending to all students' psychological and developmental needs. Unlike in *Tinker*, Plaintiffs-Appellants' free-speech rights "colli[de] with the rights of other students to be secure and to be let alone." *Tinker*, 393 U.S. at 508. The fact of this collision would almost certainly not be enough to justify government regulation of the speech, if the parties in this case were adults in a public forum. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (holding that prosecution of defendant for burning an American flag during a protest rally violated the defendant's right to free expression under the First Amendment). We caution, however, that our decision today does not establish a precedent justifying a school's ban on student speech *merely* because other students find that speech

---

[6]Although the record does not make clear whether the fight occurred between a student who was attending William Blount High School and a student who was attending Heritage High School or between two William Blount students, there is no doubt that the fight occurred at William Blount High School. We therefore determine that in the context of other evidence of racial tensions at the school, the fight supports the school's reasonable forecast that students wearing clothing with the Confederate flag would disrupt the educational process.

offensive: we simply hold that the school's dress code as applied to ban the Confederate flag is constitutional because of the disruptive potential of the flag in a school where racial tension is high and serious racially motivated incidents, such as physical altercations or threats of violence, have occurred.

Our holding that the school in the circumstances of this case reasonably forecast the disruptive effect of the Confederate flag accords with precedent in our circuit as well as our sister circuits. In *Melton v. Young*, 465 F.2d 1332 (6th Cir. 1972), *cert. denied*, 411 U.S. 951 (1973), we held that the suspension of a student for violating a high-school code of conduct banning displays of the Confederate flag and the Confederate soldier, as well as the song "Dixie," did not violate the student's rights under the First or Fourteenth Amendments. Evidence on the record showed that during the 1969-1970 academic year, the school that implemented the ban had become "racially polarized as a result of continuing controversy over the use of the Confederate flag and the song Dixie at various school functions." *Id.* at 1333. Racial tension in the school disrupted classes and led school authorities "to call for police assistance amid several confrontations and also to close the school for the purpose of restoring order and calming tensions." *Id.* The evidence in *Melton* supporting the school's rationale for the ban is, in two respects, stronger than that in the instant case: past disruptive conflict in the school had centered on the Confederate flag and disruption had led authorities not only to "lockdown" the school but to actually close it. Nevertheless, as we noted above, "*Tinker* does not require school officials to wait until the horse has left the barn before closing the door." *Lowery*, 497 F.3d at 591-92. In another sense, despite the fact that the displays of the Confederate flag did not themselves apparently instigate racial conflict, the evidence supporting the ban in the instant case is stronger than in *Melton* because racial tension had produced physical confrontations and threats against students' lives. In sum, the holding in *Melton* supports our decision that a school may reasonably forecast that the Confederate flag would cause substantial and material disruption of a school when the school had recently experienced intense racial conflict.

Furthermore, the record in the instant case closely parallels that in *West v. Derby Unified School District No. 260*, 206 F.3d 1358 (10th Cir. 2000). In *West*, a middle-school assistant principal had suspended a student who had drawn a Confederate flag on a sheet of paper during a class, in violation of a school's racial-harassment policy that prohibited students from possessing written material "that is racially divisive or creates ill will or hatred." *Id.* at 1361. The policy listed the Confederate flag as an example of the banned material. *Id.* In the three years prior to the incident, the school at issue had experienced "verbal confrontations . . . between black and white students"; white students wearing clothing depicting the Confederate flag and black students wearing clothing invoking the ideology of Malcolm X; the circulation of racist materials among students by non-student members of the Aryan Nation and Ku Klux Klan; "graffiti stating such things as 'KKK' (Ku Klux Klan), 'KKKK' (Ku Klux Klan Killer), and 'Die Nigger'"; "reports of racial incidents on school buses and at football games"; and "[a]t least one fight . . . as a result of a student wearing a Confederate flag headband." *Id.* at 1362. The Tenth Circuit concluded that "[t]he evidence . . . reveals that based upon recent events, [the school district] officials had reason to believe that a student's display of the Confederate flag might cause disruption and interfere with the rights of other students to be secure and let alone." *Id.* at 1366.

Just as in *West*, in the instant case the school based its clothing ban on the existence of racial tension, threatening graffiti, reports of racially motivated confrontations, and at least one fight. The only potentially significant difference between the records in the two cases is that the February 22, 2005 fight in the instant case did not involve an image of the Confederate flag. Given binding precedent in the Sixth Circuit interpreting *Tinker*, however, we do not think any difference between the record in the instant case and that in *West* is significant enough to distinguish *West*. Indeed, we

find *West* consistent with our decision in *Melton* and, therefore, consider *West* to constitute persuasive precedent.[7]

### 3. Alleged Viewpoint Discrimination

Plaintiffs-Appellants argue that the ban on clothing depicting racially divisive symbols, and specifically the ban on the Confederate flag, discriminates on the basis of viewpoint and unconstitutionally suppresses particular ideas. Plaintiffs-Appellants Br. at 19-26. In *Tinker*, the Supreme Court rested its holding striking down the defendant school's ban on armbands on the finding that "the action of the school authorities appear[ed] to have been based upon an urgent wish to avoid the controversy which might result from the expression" rather than from reasonable "anticipat[ion] that the wearing of the armbands would substantially interfere with the work of the school or impinge upon the rights of other students." *Id.* at 509-10. The Court proceeded to observe in dicta, however, that its decision also reflected the Court's concern "that the school authorities did not purport to prohibit the wearing of all symbols of political or controversial significance." *Id.* at 510. There existed evidence that some students at the school wore buttons related to political campaigns as well as the Iron Cross, a Nazi symbol, and that the school did not ban these symbols. *Id.* at 510-11. Significantly, the Court in *Tinker* did not hold that a viewpoint-discriminatory rule in the schools would necessarily be unconstitutional; such a rule would still be constitutional if it met the disruption standard outlined in the opinion. Specifically, the Court concluded its paragraph discussing the viewpoint-discriminatory character of the ban on armbands with the following statement: "Clearly, the prohibition of expression of one particular opinion, *at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline*, is not constitutionally permissible." *Id.* at 511 (emphasis added).

---

[7]The Eleventh Circuit has upheld school districts' bans on the display of the Confederate flag under both *Tinker* and *Fraser*. *Scott v. Sch. Bd. of Alachua County*, 324 F.3d 1246, 1249 (11th Cir.), *cert. denied*, 540 U.S. 824 (2003); *White v. Nichols*, No. 02-01712-CV-P-NE, 2006 WL 1594213, at *2 (11th Cir. June 12, 2006); *see also Denno v. Sch. Bd. of Volusia County*, 218 F.3d 1267, 1275-78 (11th Cir.) (affirming the dismissal of plaintiff students' 42 U.S.C. § 1983 claim against school administrators in their individual capacities because it was not clearly established that the school would violate students' First Amendment rights by banning the Confederate flag and affirming the dismissal of § 1983 claims against the school because plaintiffs had not created a genuine issue of material fact that school administrators possessed final-decisionmaking authority or that a custom or practice of banning the Confederate flag existed), *cert. denied*, 531 U.S. 958 (2000). Although the Eleventh Circuit's decisions do not conflict with our holding today, we decline to consider these decisions persuasive precedent because we disagree that a display of the Confederate flag constitutes vulgar or "plainly offensive" speech under *Fraser*, 478 U.S. at 683. Rather, the display of the Confederate flag by a student constitutes political speech that is protected under the First Amendment and may only be regulated if a school meets the *Tinker* standard.

The Third Circuit's decision in *Sypniewski v. Warren Hills Regional Board of Education*, 307 F.3d 243 (3d Cir. 2002), *cert. denied*, 538 U.S. 1033 (2003), is readily distinguishable. In *Sypniewski*, the Third Circuit considered a challenge to the application of a racial-harassment policy, analogous to that at issue in *West*, to ban a T-shirt featuring a joke by comedian Jeff Foxworthy giving the "Top 10 reasons you might be a Redneck Sports Fan." *Id.* at 249-50. The Third Circuit reversed a district court decision denying the plaintiff students a preliminary injunction against the policy as enforced to ban the Foxworthy T-shirt. In finding that the plaintiffs had a likelihood of success regarding their claim that the as-applied ban violated their rights under the First Amendment, the Third Circuit distinguished *Sypniewski* from cases including *West* and *Melton* that upheld the ban on the Confederate flag: "Plaintiffs have not challenged a ban on the Confederate flag; they challenge the banning of a T-shirt that bore no Confederate flag and had no similarly disruptive history." *Id.* at 254. The *Sypniewski* opinion explained: "There is no suggestion in the record that any part of the Confederate flag clothing other than the flag itself was seen as a provocative and offensive symbol. In short, there is little if any history of the use of the word 'redneck' itself that would support its ban." *Id.* at 256.

A final Fifth Circuit decision regarding the Confederate flag in public schools similarly does not conflict with our holding but is inapplicable because of its distinct procedural history. In *Augustus v. School Board of Escambia County*, 507 F.2d 152, 158 (5th Cir. 1975), the Fifth Circuit held that a district court had the authority categorically to ban the use of the Confederate flag as a symbol in a school, if necessary to implement a court order to desegregate the school. The Fifth Circuit further held, however, that the school had overstepped its authority in implementing a categorical ban without determining "whether an injunction against the *misuse* of flags and symbols would be preferable to a complete prohibition." *Id.* at 158-59.

Our precedent interpreting the status of viewpoint-discriminatory school rules under *Tinker* is complicated. The code of conduct at issue in *Melton* explicitly prohibited images of the Confederate flag, the Confederate soldier, and the song "Dixie." 465 F.2d at 1333-34. The code did not prohibit symbols that might have been similarly controversial at a newly integrated public high school during the time-period in question: the late 1960s and early 1970s. *Id.* Thus, one could characterize the ban at issue in *Melton* as viewpoint discriminatory because it prohibited symbols that some people might perceive as celebrating Southern heritage, or even white supremacy, but did not prohibit symbols perceived as celebrating the North's defeat of the South in the Civil War, racial equality, or black power. We upheld the ban, however, regardless of any viewpoint discrimination because it met the disruption standard set forth in *Tinker*. *Melton*, 465 F.2d at 1335. Indeed, the *Melton* opinion does not address any argument by the plaintiffs in that case regarding viewpoint discrimination.

A subsequent Sixth Circuit decision, *Castorina v. Madison County School Board*, took the view that "even if there has been racial violence that necessitates a ban on racially divisive symbols, the school does not have the authority to enforce a viewpoint-specific ban on [some] racially sensitive symbols and not others." 246 F.3d at 544. *Castorina* reversed and remanded a district court's grant of summary judgment to a defendant school board because the plaintiff students had created a genuine issue of material fact regarding whether the school banned clothing with images of the Confederate flag but did not ban the wearing of clothing with images of or allusions to "Malcolm X and the Black Muslim movement." *Id.* at 541. The statement in *Castorina* that a viewpoint-discriminatory clothing ban would be unconstitutional is in tension with our decision in *Melton* upholding the constitutionality of such a ban under *Tinker*'s substantial-and-material-disruption standard.

Although one panel of this circuit cannot overrule a prior panel, *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985); 6TH CIR. R. 206(c), an intervening Supreme Court decision gave the *Castorina* panel authority to modify the holding in *Melton*. The *Castorina* panel based its holding regarding the unconstitutionality of viewpoint-discriminatory clothing bans on *Tinker* and two other Supreme Court decisions: *Police Department of City of Chicago v. Mosley*, 408 U.S. 92 (1972), decided two months before our decision in *Melton*, and *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, 828-29 (1995), decided over a decade after *Melton*. *Castorina*, 246 F.3d at 542. To the extent that *Castorina* rested its holding on *Rosenberger*, decided after *Melton*, the *Castorina* panel had the authority to modify the *Melton* panel's interpretation of *Tinker*. In *Rosenberger*, the Court considered a university's denial of student-activity funds to a student newspaper that would otherwise be eligible for funds but for the fact that the newspaper "promote[d] or manifest[ed] a particular belie[f] in or about a deity or an ultimate reality." 515 U.S. at 825-27. The Court held that because the University had opened the student-activity funds as a limited public forum (in a conceptual rather than spatial sense), the University could not discriminate on the basis of viewpoint. *Id.* at 828-30. Therefore, once the University allowed the disbursement of funds to groups discussing religion as a subject matter, the university could not deny funds to "those student journalistic efforts with religious editorial viewpoints." *Id.* at 831, 837. *Castorina* applied the principles set forth in *Rosenberger* to the high-school setting, holding that schools' regulation of student speech must be consistent with both the *Tinker* standard and *Rosenberger*'s prohibition on viewpoint discrimination. Accordingly, we cannot affirm the grant of summary judgment to the school if Plaintiffs-Appellants have created a genuine issue of material fact that the school implemented the clothing ban in a viewpoint-discriminatory manner.

Plaintiffs-Appellants argue that the school engages in viewpoint discrimination by banning racially divisive symbols but not racially inclusive symbols. Plaintiffs-Appellants Br. at 19-22. The Board argues that it enforces a facially neutral ban on racially divisive symbols in a non-discriminatory manner. Defendant-Appellee Br. at 34. In *Rosenberger*, the Supreme Court illuminated the often imprecise distinction between content-based and viewpoint-discriminatory

restrictions on speech. "The necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics." *Rosenberger*, 515 U.S. at 829. "Once it has opened a limited forum, however, the State must respect the lawful boundaries it has itself set." *Id.* "The State may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum,' . . . nor may it discriminate against speech on the basis of its viewpoint." *Id.* (quotation omitted). Thus, the Court "observe[s] a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations." *Id.* at 829-30.

The two sides in this litigation have presented competing paradigms for what we should view as constituting content-based and viewpoint-based regulations on speech, in the circumstances of this case. Plaintiffs-Appellants suggest that the school may restrict student speech regarding race as a general topic, but may not ban racially divisive speech while allowing racially inclusive speech. By contrast, the school suggests that the restriction on racially divisive clothing is a permissible content-based restriction and that our inquiry should be whether the clothing ban is enforced in a viewpoint-discriminatory manner.

We agree with the school. As an initial matter, Plaintiffs-Appellants' suggested definition of "content" in this case is so abstract as to approach absurdity. Considering the salience of race to our nation's history and contemporary political and social debates, any public school would seriously hamper its ability to foster thoughtful and responsible citizens by prohibiting all student speech and expression about any topic dealing with race. Moreover, we find Plaintiffs-Appellants' effort to redefine "content" and "viewpoint" to be a red herring. In *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992), the Supreme Court explained that a blanket ban on the use of "odious racial epithets" by "proponents of all views" constitutes mere content-based regulation, while a ban on the use of racial slurs by one group of speakers but not "those speakers' opponents" constitutes viewpoint-discrimination. *Id.* at 391. Applying this distinction to the instant case, it is clear that the school's ban on disruptive speech does not engage in viewpoint discrimination. The school bans all symbols which "cause[] disruption to the educational process," regardless of whether the disruption arises because of a student's racial animus, or for another reason entirely. J.A. at 156 (Hord Aff. Ex. 1 at ¶ 4(f)). Indeed, based on the record in this case, there is no evidence that the ban on disruptive symbols would not have been applied equally to a student displaying a Confederate flag in solidarity with hate groups, and another who displayed a Confederate flag in a circle with a line drawn through it. Thus, there is no indication that the school permits "one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules." *R.A.V.*, 505 U.S. at 392. Both proponents of racial tolerance and proponents of racial hatred are forbidden to display the Confederate flag.

Furthermore, although the restriction on racially intolerant but not racially tolerant messages may be unconstitutional as applied to adults acting in a public forum, *R.A.V.*, 505 U.S. at 391-94, the same is not true in the public schools. "Public education must prepare pupils for citizenship in the Republic. . . . It must inculcate the habits and manners of civility as values in themselves conducive to happiness and as indispensable to the practice of self-government in the community and the nation." *Fraser*, 478 U.S. at 681 (quoting C. BEARD & M. BEARD, NEW BASIC HISTORY OF THE UNITED STATES 228 (1968)). Given the extensive Supreme Court precedent affirming the unique mission of public education and holding that the free-speech rights of public-school students are not coextensive with those of adults, we believe that the exclusion of racially divisive symbols in a school that has experienced intense racial tensions is a permissible content-based restriction. The critical question, therefore, is whether the school has enforced its facially neutral, written dress code banning racially divisive symbols in a viewpoint-discriminatory manner.

Plaintiff-Appellant Barr stated that it was not until after the "hit list incidents" that the school began enforcing a ban on clothing depicting the Confederate flag, and prior to that time Barr had worn such clothing. J.A. at 243 (Barr Dep. at 16:11-19). Hord confirmed this understanding of the dress code's enforcement. J.A. at 110 (Hord Dep. at 13:6-21) (noting that the policy was not really enforced until the "hit lists" appeared on the restroom walls and the "racial graffiti, threats, complaints from parents, [and] a lot of racial tension.").[8] That the school only began rigorously to enforce the dress code following the "hit lists," however, does not mean it did so in a viewpoint-discriminatory manner. Lafon attests that he has complied with Hord's direction "to apply the provisions of the dress code evenly without viewpoint discrimination." J.A. at 51 (Lafon Aff. at ¶ 4).

The school specifically identified the Confederate flag as subject to enforcement as a violation of the dress code, but also intended the ban to apply to other racially divisive symbols that could reasonably be expected to cause disruption in the school. Hord attests: "In banning racially divisive symbols, I specifically included the Confederate [f]lag because it had been disruptive; however, the Principal of William Blount High School was instructed to ban any racially divisive symbols or flags that caused disruption or was likely to cause disruption." J.A. at 153 (Hord Aff. 4/3/07 at ¶ 8); *see also* J.A. at 110 (Hord Dep. at 15:12-18); J.A. at 98 (Lafon Dep. at 9: 11-17). While the school has specifically and explicitly banned the Confederate flag as a result of racial tension in the schools, J.A. at 110 (Hord Dep. at 14: 15-19), the school has not yet done so with respect to other political symbols because of an alleged absence of necessity. In other words, the school alleges that because other symbols have not yet caused a disruption, they have not been explicitly banned. J.A. at 110 (Hord Dep. at 14:24-15:4). Thus, Hord attests that he expects Lafon to enforce a ban on any other flag "*[i]f* it became disruptive and it proved to be." J.A. at 110 (Hord Dep. at 15:8) (emphasis added). Hord reiterated at deposition that under the policy, Lafon would enforce a ban against any flag that "became disruptive and offensive to a group to the point [at which] it was disruptive." J.A. at 122 (Hord Dep. at 62:13-15). Thus, for example, while the school does not currently ban the Canadian flag, "[i]f it became disruptive, if there is someone there that had a deep conceded problem with the Canadian flag and [would] fight you over it, it would become something that we [would] need to deal with." J.A. at 122 (Hord Dep. at 63:12-15). Plaintiffs-Appellants have produced no evidence suggesting that the school did not have a policy of applying the ban to all disruptive, racially divisive symbols and not just the Confederate flag.

On the one hand, the evidence on the record that the school has explicitly and prospectively banned the Confederate flag but has not done the same with respect to other symbols supports Plaintiffs-Appellants' argument that the enforcement of the dress code is viewpoint discriminatory. The evidence is uncontested that at the opening assembly of the 2005-2006 school year, Lafon announced only that the dress code's prohibition applied to the Confederate flag and did not specifically cite any other flags or symbols as similarly prohibited. In *Castorina*, we held that the First Amendment prohibited not only the kind of "formally targeted ban" present in *Tinker* but also "a facially neutral policy that is enforced . . . in a content-specific manner." *Castorina*, 246 F.3d at 542. One could argue that the school's announcement that the Confederate flag fell within the dress code's prohibition chilled the expression of students who desired to wear emblems of the Confederate flag, whereas students desiring to wear racially divisive symbols other than the Confederate flag were free to test the boundaries of the dress code. Those students' speech would be censored only after they wore a divisive symbol and not prospectively. Ultimately, however, we decline to hold that the fact of Lafon's announcement regarding the Confederate flag alone demonstrates that the school enforces the ban on racially divisive symbols in a viewpoint-

---

[8]Hord added that sporting events and after-school activities were an exception. J.A. at 116 (Hord Dep. at 38:25-39:5). In those environments, "the flag has not been banned because of the magnitude of being able to ban it." J.A. at 116 (Hord Dep. at 39:1-5).

discriminatory manner. The school required all students to take home a planner containing a copy of the school rules, including the dress code's ban on racially divisive symbols, and to have their parents sign a page of the planner attesting that the students had read it. J.A. at 102 (Lafon Dep at 27:3-7). Lafon's announcement that the Confederate flag lay within the scope of the ban did not narrow its breadth but rather clarified that the ban covered at least one symbol that students had previously worn on their clothing. We cannot require that, every time a school official explains a policy restricting students' speech, the official must offer a comprehensive list of the applications of the policy so as to avoid a finding that the official enforced the policy in a viewpoint-discriminatory manner.

Were there evidence that the school *in practice* enforced the dress code against the Confederate flag but not against other racially divisive symbols, we would need to reverse the grant of summary judgment for the school. But Plaintiffs-Appellants have produced no more than "a scintilla of evidence" that the school fails to enforce the dress code against racially divisive symbols other than the Confederate flag. *Anderson*, 477 U.S. at 252. Both parties construe Malcolm X iconography as the ideological counterpoint to the Confederate flag, and thus we would have to reverse the grant of summary judgment were there evidence on the record that the school failed to enforce the dress code to prohibit clothing with Malcolm X iconography. In contrast to *Castorina*, 246 F.3d at 541-42, in which there existed a genuine issue of material fact regarding whether the school refused to ban apparel celebrating Malcolm X, there is no similar issue of fact in the instant case. Lafon attests that other flags and symbols would fall under the ban "if they are disruptive. . . . a Malcolm X shirt or some national flag, Mexican flag might possibly be, different things from that standpoint that whatever would cause a disruption." J.A. at 101 (Lafon Dep. at 22: 20, 22-25). Lafon attests, however, that "[t]here have been no reported incidents of students wearing clothing emblazoned with Malcolm X words or caricatures, or international flags." J.A. at 51 (Lafon Aff. at ¶ 4).

Plaintiffs-Appellants have not produced evidence disputing Lafon's testimony that would create a genuine issue of material fact regarding discriminatory enforcement of the dress code. Barr declares in his affidavit that he has seen other students wear clothing depicting Malcolm X and national flags during the 2005-2006 school year. J.A. at 27 (Barr Aff. at ¶ 9). Barr's declaration in the joint appendix is not signed. Furthermore, Barr stated at deposition that when he saw students, "[o]nce or twice," wearing clothing like a Malcolm X shirt, he told "teachers" and "it came to a stop."[9] J.A. at 247 (Barr Dep. at 40:4-14). Barr affirmed that, as far as he knew, the same penalties for wearing Confederate flag clothing applied to wearing the other types of potentially disruptive clothing and he "never saw it enforced any differently." J.A. at 248 (Barr Dep. at 41:8-12).[10] Chris White's declaration states that "[o]n several occasions during the 2005-2006 school year [she] ha[d] seen other students . . . wear clothing that depicted foreign national flags, Malcolm X symbols, and political slogans." J.A. at 25 (C.W. Decl. at ¶ 9). Chris White testified at deposition, however, that she was not aware of students wearing Malcolm X clothing, and was "not really sure" whether she had seen students wearing national flags on their clothing but thought she had seen "Canadian flags and Mexican flags." J.A. at 255-56 (Chris White Dep. at 9:20-10:1). Chris White's declaration in the joint appendix is neither dated nor signed, and thus we cannot consider the declaration to create a factual issue when it contradicts her own deposition testimony. *See Reid v. Sears, Roebuck & Co.*,

---

[9] At some point in time (it is not clear from the record), Barr asked students to sign a petition "requesting that the students be allowed to wear Confederate clothing." J.A. at 244 (Barr Dep. at 22:20-23). It is not clear what happened to the petition, or whether it was presented to any school authority.

[10] Later in his testimony, however, Barr stated that he "didn't like [sic] actually see [students] disciplined" for wearing Malcolm X clothing. J.A. at 297 (Barr Dep. at 56:5-6). That Barr did not see the students disciplined, however, does not negate the fact that he was aware of school policy enforcing the dress code against the wearing of clothing celebrating Malcolm X.

790 F.2d 453, 460 (6th Cir. 1986). Lastly, Craig White also testified at deposition that he wasn't aware of students wearing Malcolm X clothing or foreign national flags. J.A. at 260 (R. Craig White Dep. at 7:7-15). Thus, Plaintiffs-Appellants have not created a genuine issue of material fact that the school enforced the dress code's prohibitions against the Confederate flag but not against clothing with Malcolm X iconography. Accordingly, under *Tinker* and its progeny in the Sixth Circuit—*Melton* and *Castorina*—we affirm the district court's grant of summary judgment to the school with respect to Plaintiffs-Appellants' First Amendment claim.

## C. Plaintiffs-Appellants' Equal Protection Claim

In the circumstances of this case, our analysis of Plaintiffs-Appellants' Equal Protection claim is essentially the same as our analysis of Plaintiffs-Appellants' First Amendment claim. *See R.A.V.*, 505 U.S. at 384 n.4 (noting that the Supreme "Court itself has occasionally fused the First Amendment into the Equal Protection Clause . . . with the acknowledgment . . . that the First Amendment underlies its analysis"). Because the distinction between the wearing of racially divisive and racially inclusive symbols pertains to "expressive conduct within the protection of the First Amendment," this provision of the school's dress code "must be [narrowly] tailored to serve a substantial governmental interest." *Mosley*, 408 U.S. at 99, 101. The government interest in this case—the school's mission to educate its students in a learning environment conducive to fostering both knowledge and democratic responsibility—is undeniably a substantial one. The question of whether the dress code's ban on racially divisive symbols is narrowly tailored to that purpose asks us to inquire whether the ban meets the standard set forth in *Tinker*. As we have demonstrated above, the evidence on the record establishes that the school enforces the dress code in a viewpoint-neutral manner to ban those racially divisive symbols that the school reasonably forecasts will substantially and materially disrupt schoolwork and school discipline. We therefore hold that the dress code's ban on racially divisive symbols is narrowly tailored to the state and the school's substantial interest in educating students, and we affirm the district court's grant of summary judgment to Defendants-Appellees on Plaintiffs-Appellants' Equal Protection claim.

We reject Plaintiffs-Appellants' argument that the instant case is analogous to the Supreme Court's decision in *Police Department of City of Chicago v. Mosley*. In *Mosley*, the Court invalidated a city ordinance that placed geographic and temporal restrictions on picketing outside a school but exempted peaceful labor picketing. 408 U.S. at 92-94. The Court concluded that the ordinance's content-based restriction on speech could be upheld only if necessary to serve a substantial government interest in a narrowly tailored manner. *Id.* at 98-99. The Court further determined that the ordinance was not narrowly tailored to the city's "interest in preventing disruption by the . . . excesses of some nonlabor picketing" because it targeted "both peaceful and violent [nonlabor] picketing." *Id.* at 101-02. The school argues that *Mosley* is not applicable because it involved a challenge to a facially discriminatory rather than a facially neutral regulation on speech. But that is not the critical distinction between the cases; as stated above, we apply strict scrutiny under the Equal Protection Clause to a statute infringing on speech protected by the First Amendment, whether plaintiffs bring a facial or as-applied challenge. The dispositive distinction between *Mosley* and the instant case is that *Mosley* involved adult speech in a public forum, while the instant case involves student speech in a public school, which is a limited public forum. Thus, *Tinker* sets the guiding standard for the instant case while that was not true of *Mosley*.

Plaintiffs-Appellants argue that under *Mosley*, the school needs to show that the Confederate flag is "clearly more disruptive" than other flags. Plaintiffs-Appellants Br. at 16 (quoting *Mosley*, 408 U.S. at 100). Plaintiffs-Appellants argue further that the determination must be made on an individualized basis. Plaintiffs-Appellants Br. at 16-18. These arguments do not advance our resolution of Plaintiffs-Appellants' Equal Protection claim. By complying with the *Tinker* standard, the school has already shown that the Confederate flag and other racially divisive symbols have a far greater disruptive effect than symbols not similarly prohibited. Moreover, under *Tinker*,

individualized analysis of each student's clothing every day, *see* Plaintiffs-Appellants Br. at 16 and Reply Br. at 11, would be unnecessary in a school environment in which school officials reasonably believe that depictions on clothing of an object, such as the Confederate flag, would cause disruptions. *See Lowery*, 497 F.3d at 591-92 (holding that under the *Tinker* standard a school does not need to wait until a disruption has actually occurred before regulating student speech).

## D. Plaintiffs-Appellants' Due Process Claim

The district court did not analyze the Due Process claim explicitly but granted summary judgment to the Board on this claim. Plaintiffs-Appellants did not argue due process (substantive or procedural) in their summary judgment motion, mentioned it once (without analysis) in their opening brief for this court, Plaintiffs-Appellants Br. at 14, and devoted two pages to it in their Reply brief, Reply Br. at 10-11 (arguing that the procedural-due-process elements "align themselves with the requirements of *Mosley*," which conducts an equal-protection analysis). "[A]n issue is deemed forfeited on appeal if it is merely mentioned and not developed." *United States v. Clark*, 469 F.3d 568, 570 (6th Cir. 2006) (citing *United States v. Reed*, 167 F.3d 984, 993 (6th Cir.1999), *cert. denied*, 528 U.S. 897 (1999)); *S.H.A.R.K. v. Metro Parks Serving Summit County*, 499 F.3d 553, 564-65 (6th Cir. 2007) (citing *Reed*, 167 F.3d at 993). Therefore, because Plaintiffs-Appellants failed to develop adequately this issue in their opening brief, we do not consider it.

## III. CONCLUSION

Because we conclude that the school reasonably forecast that images of the Confederate flag would substantially and materially disrupt the school environment, we **AFFIRM** the grant of summary judgment to the Board with respect to Plaintiffs-Appellants' First Amendment claim. Furthermore, because we conclude that the dress code's ban on racially divisive symbols, as enforced against the Confederate flag, is narrowly tailored to a substantial government interest, we **AFFIRM** the grant of summary judgment to the Board with respect to Plaintiffs-Appellants' Equal Protection claim. Lastly, Plaintiffs-Appellants have forfeited their Due Process claim, and we **AFFIRM** the grant of summary judgment with respect to this claim.